**DEMOCRAT PRINTING CO. v. FEDERAL COMMUNICATIONS COMMISSION et al.**

No. 10692.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 26, 1952.

Decided June 12, 1952.

**300**

L. Alton Denslow, Washington, D. C., with whom Douglas W. Hartman, Washington, D. C., was on the brief, for appellant.

Daniel R. Ohlbaum, Attorney, Federal Communications Commission, of the bar of the Supreme Court of New York, Washington, D. C., pro hac vice, by special leave of Court, with whom Benedict P. Cottone, General Counsel, Federal Communications Commission, and Richard A. Solomon, Acting Assistant General Counsel, Federal Communications Commission, Washington, D. C., were on the brief, for appellee. Harry M. Plotkin, Acting General Counsel, Federal Communications Commission, and Max Goldman, Assistant General Counsel, Federal Communications Commission, Washington, D. C., also entered appearances on behalf of appellee.

John Erle Stephen, Houston, Tex., for intervenor.

Before KIMBROUGH STONE, Circuit Judge, retired (sitting by designation), and WILBUR K. MILLER and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Texas Star Broadcasting Company was awarded a permit by the Federal Communications Commission to construct a radio station in Dallas, Texas. Operating as authorized on a frequency of 740 kilocycles, the new station would interfere with station KSEO which broadcasts from nearby Durant, Oklahoma, on a 750 kilocycle frequency. In fact, the stronger Texas Star signal threatens KSEO with daytime[1] displacement of its signal in an area including as much as 41 per cent of the population previously served by that station.[2] Because of this threat the Democrat Printing Company, licensee of KSEO, intervened in the proceeding before the Commission. Its intervention proved insufficient to prevent issuance of a permit to Texas Star and so it appealed to this court.

*I. Comparative Hearing*

There is no question but that Texas Star's substantial electrical interference with KSEO is in fact and in legal effect a modification of KSEO's existing license.[3] Such modification can be authorized if

"in the judgment of the Commission [it] will promote the public interest, convenience, and necessity * * *."[4] The Commission's Rule 3.24 further spells out this statutory requirement in modification cases:

"An authorization for a new standard broadcast station or increase in facilities of an existing station will be issued only after a satisfactory showing has been made in regard to the following, among others: * * *.

"(b) That objectionable interference will not be caused to existing stations or that *if interference will be caused the need for the proposed service outweighs the need for the service which*

---

1. KSEO broadcasts during the daytime only. J.A., p. 198.

2. KSEO, as a Class II station, is normally entitled to protection from daytime interference within the area where its broadcast signal is no weaker than 0.5 millivolts per meter (referred to as the 0.5 mv/m contour). Standards of Good Engineering Practice Concerning Standard Broadcasting Stations, 47 Code Fed. Regs., p. 125 (1949). For further explanation of the protected contour concept, see dissenting opinion in WJR, The Goodwill Station v. Federal Communications Commission, 1948, 84 U.S. App.D.C. 1, 19–20, 174 F.2d 226, 244–245, reversed Federal Communications Commission v. WJR, 1949, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353. Because of a conflict in the engineering testimony presented by Texas Star and KSEO, the Commission did not determine the extent to which Texas Star would in fact interfere with KSEO. It assumed for purposes of its decision, however, that the interference would be as great as KSEO's evidence showed. J.A., pp. 225–32, 238–239.

3. Federal Communications Commission v. National Broadcasting Co. (KOA), 1943, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374; cf. L. B. Wilson, Inc., v. Federal Communications Commission, 1948, 83 U.S.App.D.C. 176, 180, 170 F.2d 793, 797.

4. 48 Stat. 1064, 1087 (1934), 47 U.S.C.A. § 312(b).

*will be lost by reason of such interference."* [5]

■ If the requirements of the public interest are to be satisfied, the Commission must consider not only the public benefit from the operation of the new station, but also any public loss which it might occasion. Only by such a balancing can the Commission reach a legally valid conclusion on the ultimate question of the public interest.

■ Here the record establishes only one side of the equation—that the Dallas area needs the type of service proposed by Texas Star and that Texas Star is fit, willing and able to provide that service.[6] But there is nothing whatsoever which goes to the question of "the service which will be lost" as a result of KSEO's displacement by Texas Star. In fact, the Commission specifically said that it

"did not rest its decision upon any comparative consideration of KSEO and the Dallas proposal, but upon the conclusion that although the interference to KSEO be as serious as portrayed by that station, a grant of Texas Star's application would be in the public interest and consonant with the requirement of a fair, efficient and equitable distribution of radio service between communities." [7]

■ By refusing to base its decision upon a "comparative consideration of KSEO and the Dallas proposal," the Commission effectively discarded its Rule 3.24 and overlooked one factor which is inherent in the complex of the public interest. Suppose, for example, that KSEO devoted a large portion of its broadcasting efforts to meeting the particular needs of the people in the interference area, that many of its programs originated there, and that it was the only station which was especially solicitous of that particular area. Obviously in such a case, the listeners affected might well need the station threatened with displacement more than they would if it did not program especially for them and if other stations, including the proposed one, did. We do not say that the Commission would have to refuse the license in the first case and grant it in the second. We say only that where 164,300 people are threatened with loss of a broadcast service, as here, the Commission could not regard as irrelevant what Rule 3.24 and the public interest command—a determination as to the comparative merits of the two stations in the area of interference.

■ Nor does it suffice to say that since Texas Star's signal will replace KSEO's for the interference area, there is no "loss of service" within the meaning of Rule 3.24. We do not see how the Commission can adopt qualitative criteria of need to justify Texas Star's entry upon the Dallas scene and then use purely quantitative criteria of coverage to determine "need for the services * * * lost by reason of such interference." This last is as much a composite of program content, facilities and ties to the area served as is the former.[8]

■ The Commission argues that even if the record is defective in this regard, it was incumbent upon KSEO, the station being ousted, to offer evidence on comparative need in the interference area. We are unable to accept this contention. For both the hearing examiner and the Commission viewed as irrelevant any evidence on the effect which the ouster of KSEO would

---

5. 47 Code Fed.Regs. § 3.24 (1949). Emphasis supplied.

6. KSEO challenges the validity of the Commission's order insofar as it finds a need for Texas Star's proposed service in the Dallas area and finds that Texas Star is fit, willing and able to supply that service. But we think the order valid in these respects. Cf. Courier Post Pub. Co. v. Federal Communications Commission, 1939, 70 App.D.C. 80, 104 F.2d 213.

7. J.A., p. 259.

8. For similar reasons, we do not think that the fact that the entire interference area will continue to receive primary service from five stations and that most of it will receive primary service from nine other stations, J.A., p. 230, makes irrelevant a comparative weighing of service now furnished by KSEO.

have on the audience now receiving its signal. Texas Star, upon whom Rule 3.24 appears to place the burden of proof in this regard,[9] attempted to show that "KSEO does not now, nor has it in the past, programmed for the area which might be subjected to interference * * *." But the hearing officer rejected this evidence and foreclosed proof along these lines.[10] Likewise the Commission apparently agreed with its hearing examiner on this point since, as quoted above, it did not consider "comparative consideration * * * relevant."

## II. Financial Effect on KSEO

KSEO also urges that there was no substantial evidence to support the Commission's finding that "the grant to Texas Star will not impair the ability of KSEO to continue to serve the local Durant area."[11] We agree with KSEO on this point too. It does not suffice as a basis for that finding for the Commission to say that "KSEO will still continue to serve 45 miles to the south of Durant in the direction of Dallas."[12] KSEO may or may not be able to survive financially if its signal is blocked out by the proposed interference. The evidence furnishes no basis for an answer.[13] Adequate evidence on this question might include, for example, the amount of advertising revenue KSEO would lose as a result of the interference, the way in which its expenses would be affected, as well as evidence on its general financial health.[14]

In this court, the Commission advances in support of this phase of its order a reason not relied upon in its decision, namely, the failure of KSEO to present evidence showing that it would suffer adverse financial effects from the proposed

9. See Courier Post Pub. Co. v. Federal Communications Commission, 1939, 70 App.D.C. 80, 82, 104 F.2d 213, 215; Goss v. Federal Radio Commission, 1933, 62 App.D.C. 301, 302, 67 F.2d 507, 508.

10. J.A., pp. 115–17. Texas Star monitored KSEO's programs for five days in order to obtain evidence on the nature of its programming. Id. at 119–120.

The evidence does show and the Commission found, as supporting the proposition that replacement of KSEO by Texas Star would not be adverse to the public interest, that the area where Texas Star's signal will replace KSEO's is within the State of Texas and is largely within the Dallas trading area. Id. at 232. KSEO challenges the relevance of these findings, but we think that they are factors which the Commission may properly consider. KSEO also challenges, as without support in the record, the finding that the interference area is not in the Durant trading area. Id. at 239. This objection, however, was not made before the Commission and must therefore be deemed to have been waived. See p. 303 of 202 F.2d, infra.

11. J.A., p. 239.

12. J.A., p. 257.

13. Cf. American Broadcasting Co. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 343, 350–351, 179 F.2d 437, 444–445.

14. Compare findings in Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 290–291, 96 F.2d 554, 562–563, certiorari denied 1938, 305 U.S. 613, 59 S.Ct. 72, 83 L. Ed. 391, with Tri-State Broadcasting Co., Station K.T.S.M. v. Federal Communications Commission, 1939, 71 App.D.C. 157, 158, 107 F.2d 956, 957.

The mere loss of profit to an existing station would not, of course, be an adequate basis for denying a license to a proposed station. If, however, the result of the grant to the proposed station is to make it financially impossible for an existing station to continue its operations or maintain a high level of service, the resultant loss of service might be adverse to the public interest and therefore warrant denying the new license. Federal Communications Commission v. Sanders Brothers Radio Station, 1940, 309 U.S. 470, 473–476, 60 S.Ct. 693, 84 L.Ed. 869; Tri-State Broadcasting Co. v. Federal Communications Commission, 1939, 71 App.D.C. 157, 158–159, 107 F.2d 956, 957–958; WOKO, Inc., v. Federal Communications Commission, 1939, 71 App.D.C. 228, 229–230, 109 F.2d 665, 666–667; Pulitzer Pub. Co. v. Federal Communications Commission, 1937, 68 App.D.C. 124, 126–127, 94 F.2d 249, 251–252. Although these principles were laid down in cases which, unlike the instant one, did not involve electrical interference, we think the principles announced in them apply as well to economic loss occasioned by electrical interference.

operation of Texas Star. Since this data was more peculiarly within the knowledge of KSEO than of Texas Star, the Commission might have been justified in concluding that "the public is not likely to suffer if the evidence is not sufficiently strong to prevent the appellant from forgetting it at the proper time in [its] own behalf."[15] But we cannot decide now whether this reason suffices to support the order. Our review is limited to the reasons which the Commission relied upon for its action.[16]

### III. Violations of Federal Communications Commission's Standards

KSEO bases two further arguments on several alleged deviations from the Commission's Standards of Good Engineering Practice Concerning Standard Broadcasting Stations. First, these deviations are said to be so far-reaching as to amount to a change in Commission policy. Changes in policy, according to § 409(a) of the Federal Communications Act,[17] cannot be made in proceedings where, as in this one, an examiner presides. Second, KSEO argues that since there is nothing in the record to justify the Commission's departures from its Standards, the departures are arbitrary and capricious.

With one exception, which we shall discuss in a moment, all of these alleged errors are raised for the first time in this court. Therefore, even if they are meritorious, a question we do not reach, they are raised too late. The alleged violations could have been asserted in the exceptions to the proposed decision and in the motion for rehearing which was filed after the final decision.[18] Since appellant has

15. Colorado Radio Corp. v. Federal Communications Commission, 1941, 73 App. D.C. 225, 228, 118 F.2d 24, 27; cf. Johnston Broadcasting Co. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 40, 47, 175 F.2d 351, 358; Red River Broadcasting Co. v. Federal Communications Commission, 1938, 69 App.D.C. 1, 5–6, 98 F.2d 282, 286–287, certiorari denied 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400.

KSEO contends that it had no notice of the relevancy of financial injury since the issues as framed before the Commission hearings required it to show only that Texas Star's proposed signal would interfere with the existing KSEO signal in order to defeat Texas Star's application. Acting according to this view, KSEO presented no evidence at the hearing other than engineering evidence on the extent of the interference.

We think that KSEO's interpretation of the hearing issues is unduly restrictive. Issue number four was "To determine whether the operations of the proposed stations would involve objectionable interference with any existing broadcast stations and, *if so, the nature and extent thereof, the areas and populations affected thereby, and the availability of other broadcast service to such areas and populations.*" J.A., p. 13, emphasis supplied. Unless we are to ignore the italicized portion, we think the issue clear notice that the public interest might require an award to Texas Star even though the signal of other stations might suffer interference, and that any evidence showing that such interference would not be in the public interest would be relevant. The Federal Communications Act and the Commission's rules leave no doubt that in appropriate cases, licenses may be granted despite resulting interference to existing stations. 48 Stat. 1064, 1087 (1934), 47 U.S.C.A. § 312(b); 47 Code Fed.Regs. § 3.24(b) (1949). See Federal Communications Commission v. National Broadcasting Co. (KOA), 1943, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374; L. B. Wilson, Inc., v. Federal Communications Commission, 1948, 83 U.S.App.D.C. 176, 182–183, 170 F.2d 793, 799–800.

16. Cf. Securities & Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; Mississippi River Fuel Corp. v. Federal Power Commission, 1947, 82 U.S.App.D.C. 208, 224, 163 F.2d 433, 449.

17. 48 Stat. 1064, 1096 (1934), 47 U.S.C.A. § 409(a).

18. Commission rules provide that exceptions to proposed decisions, 47 Code Fed. Regs. § 1.854 (1949), and petitions for rehearing, id. at 1.893, shall state "with particularity" the alleged errors. Moreover, the rules governing proposed decisions, supra, provide ample opportunity for filing briefs and making oral arguments to the Commission on the basis of exceptions. These same rules provide that failure to raise an objection in the exceptions to the proposed decision shall constitute a waiver of the objection.

denied the Commission the first opportunity to state its views on the errors now being asserted, appellant cannot seek here the relief which it should have sought initially before the Commission.[19]

As mentioned above, KSEO did preserve its right to a decision here on the merits of one alleged violation of Commission Standards. As applied here, § 4 of the Standards provides as a general guide that the broadcasting transmitter shall be located so that not more than one per cent of the metropolitan population sought to be served by the station will be living within the "blanket area" [20] of the transmitter. The Standards further state that "the Commission will give consideration to approving locations" which constitute a deviation from the normal blanket area requirements where "it is impossible or impractical to locate a station in accordance with the [normal] specifications" upon the following three conditions: (1) "not more than 1 percent of the population * * * is included within the 500 millivolt per meter contour"; (2) "the applicant submits an affidavit setting forth the reasons why the normal specifications cannot be complied with"; (3) "the applicant will assume full responsibility for adjustment of any reasonable complaints arising from the excessively strong signals." [21]

We agree with KSEO that this Standard has been violated. On the record before us, it is somewhat difficult to determine precisely what showing was made to the Commission and what the Commission found. But it is clear that the grant to Texas Star violated even the "exception" to the normal requirements. The Commission found that 1.3 per cent of the population would be residing within the 500 mv/meter contour instead of the specified one per cent. In other words, Texas Star was proposing an exception to the exception. More important, however, is the fact that Texas Star did not submit the required affidavit nor any other document purporting to show that it was "impossible or impractical to locate [the] station in accordance with the normal specifications." We think the Commission admitted this when it stated that Texas Star "offered no evidence to show that consideration was given to any [transmitter] sites other than the ones specified herein." [22] Nor does the Commission suggest any reason why, in the public interest, the showing of no alternative site should not be required in this case. The Standard just quoted seems to authorize deviations from even the normal transmitter site requirements only where the public interest so requires and then only where compliance with the normal specifications is not practical.[23] *A fortiori*, then, a court

19. Cf. National Labor Relations Board v. Cheney California Lumber Co., 1946, 327 U.S. 385, 388–389, 66 S.Ct. 553, 90 L.Ed. 739; National Labor Relations Board v. Parkers Prairie Coop. Creamery Ass'n, 8 Cir., 1946, 154 F.2d 455, 457–458; Red River Broadcasting Co. v. Federal Communications Commission, 69 App.D.C. 1, 98 F.2d 282, certiorari denied, 1938, 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400.

20. "The 'blanket area' * * * is * * * that area adjacent to the transmitter in which the usual broadcast receiver would be subject to some type of interference to the reception of other stations due to the strong signal from the station. The normal blanket area of a broadcast station is that area lying within 250 millivolt per meter contour line." 47 Code Fed.Regs., p. 136 (1949).

21. Ibid.

22. J.A., p. 225. The Joint Appendix prepared for the use of this court contains

no affidavit or other documentary evidence of the sort required by the blanket area rule. An independent study of the original record likewise fails to disclose such documents.

23. The Commission has not consistently interpreted the requirements of the blanket area standards. On the one hand, it has laid considerable stress on the availability or non-availability of alternative transmitter sites in disapproving or approving proposed deviations from the Standards, News-Press Publishing Co., 6 Pike & Fisher Radio Reg. 1290, 1294–1295 (1951); cf. Miami Broadcasting Co., 10 F.C.C. 137 (1943). On the other hand, the Commission has permitted deviations from the Standards without considering, apparently, the availability of other transmitter sites. See Del Paso Broadcasting Co., 4 Pike & Fisher Radio Reg. 679 (1948); The Corbin Time-Tribune, Inc., 6 Pike & Fisher Radio Reg. 396 (1950).

cannot reach the question of validity of a departure from the exception to the normal rule where the showing of impracticality has neither been made nor its absence explained.[24]

### IV. Administrative Procedure Act

The final argument which we consider in detail is appellant's contention that the Commission order violates those provisions of § 5(c) of the Administrative Procedure Act[25] which require generally that decision-making and investigative or prosecuting functions of an agency be separated.[26] Before the hearings were held, the Commission announced that § 5(c) did not apply to these proceedings.[27] We need not decide whether the Commission was correct in this view, for KSEO has waived its right to have that issue decided in this court. The Commission's rules required KSEO to make a timely objection in advance of the hearings to Commission's interpretation of § 5(c).[28] This KSEO failed to do.

KSEO now says that the requirements of § 5(c) are mandatory and that waiver is impossible. We think this position untenable. The legislative history clearly indicates the possibility of specific waiver:

"No agency action taken or refused would be lawful except as done in full compliance with all applicable provisions of the bill and subject to the judicial review provided. No agreed waiver of its provisions would suffice unless entirely voluntary and without any manner or form of coercion." [29]

And waiver by non-action would reasonably follow where, as here, timely objection would have given the agency an opportunity to correct errors at the threshold of the proceedings which might otherwise require the subsequent invalidation of the entire proceeding.[30]

We think additional reasons for reversal advanced by appellant are without sufficient merit to warrant discussion.

Remanded for further proceedings in accordance with this opinion.

WILBUR K. MILLER, Circuit Judge, concurs in the result.

---

24. Texas Star argues that the order approving the proposed location of its transmitter should be affirmed since Texas Star offered "to accept responsibility for adjusting all reasonable complaints which may arise from blanket interference." J.A., p. 225. It was certainly proper for Texas Star to make such an offer. But that is already required by the Standard, and Texas Star's willingness to comply with this part of the Standard does not excuse its noncompliance with the remainder.

25. 60 Stat. 237, 240, 5 U.S.C.A. § 1004 (c).

26. Pertinent provisions of § 5(c) were embodied in Commission Rule 1.857, in effect when the alleged violations occurred. 47 Code Fed.Regs. § 1.857 (1949).

27. J.A., pp. 18, 27. The Commission's rules required it to announce in advance of hearings whether or not it considered § 5(c) of the Administrative Procedure Act applicable to the proceedings before it. 47 Code Fed.Regs. § 1.857(c) (1949).

28. Ibid.

29. H.R.Rep.No.1980, 79th Cong., 2d Sess. 47 (1946).

30. Cf. Tri-State Broadcasting Co. v. Federal Communications Commission, 1939, 71 App.D.C. 157, 159, 107 F.2d 956, 958.