**PINELLAS BROADCASTING COM-
PANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**

**The Tribune Company, Intervenor.**

No. 12545.

United States Court of Appeals
District of Columbia Circuit.

Argued June 3, 1955.

Decided Jan. 19, 1956.

Writ of Certiorari Denied
April 2, 1956.

See 76 S.Ct. 650.

Bazelon, Circuit Judge, dissented.

Mr. Telford Taylor, New York City, with whom Mr. Neville Miller, Washington, D. C., was on the brief, for appellant.

Mr. John B. Kenkel, Washington, D. C., also entered an appearance for appellant.

Mr. Warren E. Baker, Gen. Counsel, Federal Communications Commission, with whom Mr. J. Smith Henley, Asst. Gen. Counsel, Federal Communications Commission, was on the brief, for appellee.

Mr. Philip J. Hennessey, Jr., Washington, D. C., for intervenor.

Mr. Edwin S. Nail, Washington, D. C., also entered an appearance for intervenor.

Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is an appeal from an order of the Federal Communications Commission.[1] The order contained an award of a permit to construct a television station on the West Coast of Florida to operate on Channel 8. The area to be served included Tampa on the north and St. Petersburg on the south. Three applicants competed for the award—the Tribune Company located at Tampa, Pinellas Broadcasting Company located at St. Petersburg, and Tampa Bay Area Telecasting Corporation with a studio located between the other two. The award was to Tribune. Pinellas is our appellant. Tampa Bay takes no further part in the proceeding.

The administrative proceeding was meticulous in its procedural detail, beginning with a hearing before an examiner and ending with a denial of reconsideration by the Commission.

The Commission made extensive and detailed findings of facts and explained at great length its choice of the awardee. In respect to many criteria it found little or no advantage to any applicant; in respect to some it found advantage to one;

and in respect to others it found advantage to another. The decisive factor, in its judgment, was the comprehensive local live program proposal of Tribune, supported by the record it had made over the years, both in its newspaper and in its radio broadcasting, in furtherance of local civic interests and enterprises. Each of the groups owning these applicants has for years owned and operated a newspaper and a radio station in this locality under the same ownership and in the same manner as it proposes for the new television station. Extensive evidence concerning the respective performances in the use of these media was presented. The Commission rested upon that factual basis. It found that Tribune proposed a greater quantity of local live programming and that in content and the assurance of effectuation of the proposal Tribune was clearly and strikingly superior.

In applying this decisive factor the Commission refused controlling effect to the local ownership of Pinellas contrasted with the absentee ownership of Tribune. Therein, Pinellas says, it erred. Pinellas states its contention in a number of ways,[2] but in essence it is that the Commission erroneously failed to give preferential weight to Pinellas's superiority to Tribune in terms of local ownership and integration of ownership and management.

The facts on the point are that the stock of Pinellas is wholly owned by residents of St. Petersburg active in the management of the corporate affairs, whereas 90 per cent of the stock of Tribune is owned by non-residents of the area, principally by two families resident in Richmond and Chicago. The conduct of the affairs of Tribune has for many years been entrusted by the owners to a group of local residents as officers and active managers. The Commission found the stockholders of Tribune maintained a policy of autonomy in the management of the company's affairs in local

1. Section 402(b) of the Communications Act, 48 Stat. 926 (1934), as amended, 47 U.S.C.A. § 402(b).

2. E. g., it argues that Tribune has abdicated its owner responsibility.

officers having no other business interests.

The Commission says the prime factor in this particular phase of a comparative consideration is the presentation of programs of local interest and importance and, while local ownership is a fair assurance of the performance of promises made by applicants for such programs, and for that purpose is a valuable factor in many comparative judgments, such ownership is not a prime factor in itself and where, as here, an extensive record of performance is available, the record is a more reliable guide to the probability of fulfillment of promises. The same is true in respect to the integration of ownership and management.

■ The controversy is in an area into which the courts are seldom justified in intruding. The selection of an awardee from among several qualified applicants is basically a matter of judgment, often difficult and delicate, entrusted by the Congress to the administrative agency. The decisive factors in comparable selections may well vary; sometimes one applicant is superior to another in one respect, whereas in another case one applicant may be superior to its rivals in another feature. And it is also true that the Commission's view of what is best in the public interest may change from time to time. Commissions themselves change, underlying philosophies differ, and experience often dictates changes. Two diametrically opposite schools of thought in respect to the public welfare may both be rational; e. g., both free trade and protective tariff are rational positions. All such matters are for the Congress and the executive and their agencies. They are political, in the high sense of that abused term. They are not for the judiciary.

In the case at bar there appears some suggestion that the Commission has changed, or is changing, its view as to the dominant importance of local ownership and as to the evil of a concentration of the media of mass information. But

in so doing it is operating within the area of legislative-executive judgment. The courts cannot interfere so long as the process, the premises, and the judgment are not arbitrary. The rationality of some basic theses as to the public good is self-evident, and of some others is so well known as to require judicial notice. But it may sometimes be that the supporting philosophy of a general policy on such matters is so obscure as to require explanation. In such a case, if the conclusion is challenged as arbitrary, it would seem that the court, in the process of adjudicating that issue, can require a statement of the premises for and the reasoning toward the general policy. But we do not have that situation in the case at bar. No statutory provision has been violated. The bases for the Commission's selection are clearly set out and are understandable. They are reasoned and not capricious. They rest upon evidence put in the record. All parties had complete procedural opportunities. So far as the record shows, the Commission considered every suggested index of differences between the applicants. The function of the court in this case goes no further than to examine into these features of the matter.

■ In its brief Pinellas urges as error the lack of findings as to the relative needs of Tampa and St. Petersburg, as two separate communities, for service and the relative abilities of the applicants to meet each of those needs. Pinellas was not direct or specific upon the point in the proceedings before the Commission, so far as those proceedings are printed in the joint appendix. To discover the point in that text one must discover it in the general claim that the Commission erred in finding Tribune's program proposals superior to those of Pinellas. We advert to the point briefly, although ordinarily we do not, and will not, decide issues not presented observably to the agency.

Section 307(b) of the Communications Act [3] requires a fair and equitable dis-

---

3. 48 Stat. 1083 (1934), as amended, 47 U.S.C.A. § 307(b).

tribution of radio service "among the several States and communities". Rulings of the Commission [4] make clear that it regards as a specific issue the question whether license applications require consideration under this section; that is, whether more than one "community" is involved and, if so, the elements of a fair and equitable distribution. No such issue was posed by Pinellas. Indeed Pinellas expressly disclaimed that Section 307(b) was involved in the case.

Pinellas seeks to avoid its failure to raise an issue under Section 307(b) (and to explain its disclaimer) by urging that such an issue is posed only where the question is which of several communities is to receive service to the physical exclusion of the others. It says no such issue is present here. Instead it argues that, where two applicants are located in distinct communities within the same broadcast area, each serves not only the area as a whole but, principally, the community within which it is located; and that therefore comparison of the program proposals of such applicants must be predicated upon findings as to the suitability of their proposals to the communities principally served. Pinellas points to certain language contained in paragraphs 7, 8 and 9 of the Commission's Conclusions as supporting this view but claims that the required findings were never made. We think Pinellas misconceives both the scope of Section 307(b) and the language of the Commission.

■■ In requiring a fair and equitable distribution of service Section 307 (b) encompasses not only the reception of an adequate signal but also community needs for programs of local interest and importance and for organs of local self-expression. The rules and regulations of the Commission and its decisions demonstrate that it so regards the section. So, if Pinellas wished to press a point that in respect to opportunity for local expression the Tampa-St. Petersburg area is two communities, it should have presented the issue to the Commission. It cannot urge it here for the first time.

Pinellas says the Commission expressly recognized the necessity for comparative consideration of the applicants as principally serving distinct and separate communities. It says that, while the Examiner treated Tampa-St. Petersburg as a single community, the Commission expressly held that view erroneous. We find no such holding.

It is clear the Commission treated Tampa-St. Petersburg as one community, not as two. All applicants proposed a station that would render Grade A service to a wide area, including both Tampa and St. Petersburg at its center. And as to program availability the Commission was emphatic that the proposals must meet the local needs of the area, not of one separate segment of the area; it went so far as to note specifically "Tribune's manifested desire to meet the program needs of St. Petersburg as well as Tampa".

Pinellas seeks to pin its point upon a portion of the Commission's discussion of the proposed studios of the applicants. The Examiner had found that Tribune's proposed main studio would be more centrally located and more accessible to the people in "the area at large", and so he gave Tribune a preference on that ground. The Commission disagreed and held the Pinellas and Tribune studios would be equally available to the community at large. In the course of its discussion the Commission ventured upon some explanation of its Rule 3.613,[5] which permits for good cause shown the location of a main studio outside the "principal community to be served". Referring to Tampa-St. Petersburg it used the expressions "both communities" and "either community". The language of that discussion may be confusing, and

4. Head of the Lakes Broadcasting Co., 9 Pike & Fischer R.R. 1072 (FCC 1953); Lufkin Amusement Co., 8 Pike & Fischer R.R. 518, 666 (FCC 1952).

5. 47 C.F.R. § 3.613 (Rev.1953).

the subject itself may be inherently difficult. An area which is one community for reception purposes, because the prime signal will be received equally well throughout the area, may be several communities for transmission purposes because of distinct needs as to local expression. And so one "community" may be several "communities". But, where each of several applicants proposes not only area-wide signal reception but also area-wide expression opportunities, the problem of separate "communities" does not necessarily arise. There is nothing in these portions of the Commission's decision which departs from, or even throws doubt upon, its basic view and holding that this is a one-community case.

■ Pinellas makes some contention with respect to the record of past comparative participation in local affairs, but the evidence on the point was sweeping and the finding of the Commission was precise and definite. We cannot evaluate such evidence beyond assuring ourselves the conclusion of the Commission had ample support. We think it had.

■ It may well be that the courts can require an administrative agency to reconsider a decision in which important matters affecting the public interest have not been canvassed or explicitly decided by the agency, even where those questions have not been urged by any litigant before the agency or the courts. But we think no such action is called for in the present case. The final action of the Commission here finds adequate support in the record and does not appear in any respect to be clearly contrary to the public interest.[6]

The order of the Commission must be Affirmed.

### Appendix

Excerpt from conclusions reached by the Federal Communications Commission in its decision of August 4, 1954:

"21. The Commission ordinarily will incline toward an applicant not associated with the local channels of communication of fact and opinion over an applicant having such association. However, such affiliation does not exclude that applicant from comparative consideration. Although it is an important factor it must be weighed along with all other considerations to determine which of the comparative applicants might best serve the public interest. The facts relating to this area of comparison briefly are as follows: Tribune publishes one of the two English language newpapers in Tampa; it is the licensee of Station WFLA, one of the two 5 kw unlimited time stations in Tampa. In addition, there are two Spanish language newspapers and three daytime only stations in Tampa. The controlling stockholders, namely, the Bryan family, have controlling interests in two daily newspapers published in Richmond, Virginia; Radio Station WRNL–AM and FM, Richmond; and in an applicant for a television station in Richmond. Tribune plans to separate the operations of the radio and television stations except insofar as heads of certain departments and sections who will function for both. Pinellas is the licensee of Station WTSP, one of the two 5 kw unlimited time stations in St. Petersburg. There is also a daytime only station in St. Petersburg. Mr. Poynter, Pinellas' principal stockholder, is also controlling stockholder of The

---

6. In reaching this conclusion we have not overlooked the Commission's treatment of the subject of diversity of media of mass communication. That treatment, which was not complained of by Pinellas either here or before the Commission, is reflected by the excerpt from the Commission's decision given in the Appendix to this opinion.

Times Publishing Company which publishes one of the two daily English language newspapers in St. Petersburg. Pinellas proposes to operate its television station as a separate unit. Tampa Bay has no affiliation with any other established media of mass communication in the area. Messrs. Hal James, Bennett and Houseknecht are stockholders in Station WVET, Rochester, New York, which is also an applicant for a television station in Rochester.[2] One other stockholder, A. Waller Smith, is a minority stockholder and director of licensee of Station WTAN, Clearwater, Florida.

"22. The Commission, in the past has held that diversification of control of the media of mass communication is desirable and that in the absence of countervailing considerations, the grant to an applicant who has fewer broadcast interests or is not affiliated with other radio or newspaper interests better serves the public interest. This factor, important as it may be, is only one of the numerous comparative factors we have weighed in reaching our decision. The weight to be accorded this factor is dependent upon the circumstances of each case. This record shows that neither Pinellas nor Tribune proposes or intends to employ joint rates in the sale of television time; that there is no indication that the operation of a television station by either Tribune or Pinellas would lessen effective competition; that there are competing radio stations and newspapers now operating in Tampa and St. Petersburg as well as a variety of media in the proposed area to be served; and that both have demonstrated their capacities to function

in the public interest. Under these circumstances, we conclude that even though Tampa Bay warrants a preference over Tribune and Pinellas in this area of comparison, it is not determinative of this proceeding. See Aladdin Radio and Television, Inc., 9 RR 1."

BAZELON, Circuit Judge (dissenting).

Tribune and Pinellas filed mutually exclusive applications for the television channel assigned to the Tampa-St. Petersburg area under the Commission's allocation plan.[1] These cities are twenty miles apart. Tribune, which proposed construction of a station in Tampa, is controlled by Richmond, Chicago and New York residents who will take no part in managing broadcasting operations. Pinellas, which proposed construction of a station in St. Petersburg, is owned by local residents who will manage all the station's affairs. In granting the application of Tribune, the Commission disregarded local ownership and ownership-management integration as values in themselves worthy of a preference. It chose to rely instead upon the past broadcast performance records of the applicants as a more reliable guide for determining which one would be more likely to effectuate its program proposals. The Commission found that both Pinellas and Tribune had "past desirable performance" records.

In its decision, the Commission stated that it had awarded "no preference [to Pinellas] * * * on the basis of integration of local ownership and management and participation in community affairs." Despite this flat statement, the Commission thereafter said, in its opinion on Pinellas' petition for rehearing, that

---

"2. The Commission records show that Veterans Broadcasting Company, Inc. was granted a construction permit to operate on Channel 10 on a share time basis.

WVET–TV started commercial operation on November 11, 1953."

1. F.C.C. Sixth Report and Order, 17 Fed. Reg. 3905, 4020 (1952).

" * * * the preference accruing to Pinellas as a result of its superiority in these factors [local ownership and ownership-management integration] is *slight* and, although not separately stated, was considered. Our intention was not to deprive, nor did we deprive Pinellas of the slight preference it merits with regard to these factors." Emphasis supplied.

Although not expressed, we must assume from the Commission's refusal to disturb the award to Tribune that it found this belatedly acknowledged "slight preference" outweighed by Tribune's "obvious superiority" in the field of local live programs. The Commission's decision had found such superiority in two of six program classifications, agriculture and education.[2] The record clearly demonstrates that the choice between Pinellas and Tribune was regarded as extremely close and that this superiority provided the "decisive" factor in favoring Tribune.[3]

Appellant contends that the Commission's substitution of past performance records for local owner-management in comparing applicants constitutes a reversal of policy which does violence to the important substantive values inherent in local ownership. It also contends that the record does not support the preference to Tribune on programming. But I think our consideration of these contentions and a final disposition of this review, should await a remand to the Commission for the purpose of supplying an essential conclusion which is missing from the present record. This conclusion relates to the issue of concentration of control and diversification of the media of mass communication. Since the Commission viewed the qualifications of the applicants as closely balanced with respect to the issues it did consider, its resolution of an issue which it did not consider might reasonably be expected to affect the result.

The existence of this issue plainly appears from the record. Pinellas is the licensee of one of three radio stations in St. Petersburg, and its principal stockholder publishes one of two daily newspapers there. On the other hand, Tribune is not only the publisher of one of two daily newspapers and licensee of one of two radio stations in Tampa but, in addition, its controlling stockholders own dominant interests in two daily newspapers and two radio stations in Richmond, Virginia, and in a corporation which is an applicant for a TV station there. The Commission concluded that these newspaper and broadcast affiliations of Pinellas and Tribune justified a preference to a third and unsuccessful applicant, Tampa Bay, who had no such affiliations.[4] But the Commission reached no conclusion on whether, as between Pinellas and Tribune, Pinellas was entitled to preference by reason of Tribune's more extensive newspaper and broadcast affiliations. Hence it would appear that the Commission did not consider the comparative merits of Pinellas and Tribune upon the issue of concentration of control and diversification of the media of mass communication.[5]

2. Dissenting Commissioner Bartley, however, felt that neither applicant was entitled to a preference based on proposed programming in view of Pinellas' "distinct superiority in its provision for local live news programs."

3. The Broadcast Bureau excepted to the initial decision because the award to Tribune was "grounded upon completely insubstantial and insignificant reasons" with the exception of the preference in programming. And this preference, the Bureau said, was unsupported by the findings.

4. Tampa Bay took no appeal.

5. In his dissent, however, Commissioner Bartley interpreted the Commission's decision as a conclusion that Pinellas was entitled to no preference over Tribune. This conclusion, if it is implicit in the decision, is unexplained. In view of Tribune's more extensive interests in communications media, an explanation of the Commission's reasoning is essential to the validity of that conclusion.

That this issue is directly related to a critically "important component of the public interest" is not open to question. Clarksburg Pub. Co. v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 211, 225 F.2d 511, 518. As the Commission has said, "One of the basic underlying considerations in the enactment of the Communications Act was the desire to effectuate the policy against the monopolization of broadcast facilities and the preservation of our broadcasting system on a free competitive basis." [6]

It is true that Pinellas did not challenge, either administratively or before this court, the Commission's failure to reach a conclusion on this issue. Under familiar principles,[7] and a review provision of the Act,[8] it may be argued that our consideration of this issue is precluded. But I think this argument cannot prevail when, as here, it would result in abandonment of our duty to require the Commission to discharge its proper function with respect to "[o]ne of the basic underlying considerations" of the Act. It clearly appears from the scheme of the Act that the Commission may not disregard issues of vital importance to the public interest simply because they are not presented by the parties. Thus § 309 provides for the specification of issues by the Commission, quite apart from those the parties raise, in both comparative and protest proceedings.[9] And, under § 403, the Commission has full power to "institute an inquiry, on its own motion" into any

matter before it. The purpose of this broad grant of authority is to enable the Commission to explore all basic issues relevant to the Act's public interest criterion. It expresses congressional recognition of a principle which flows from the inherent nature of administrative tribunals. Unlike courts, regulatory agencies are not confined by the "conventional judicial modes for adjusting conflicting claims—modes whereby interested litigants define the scope of the inquiry and determine the data on which the judicial judgment is ultimately based. Administrative agencies have power themselves to initiate inquiry, or, when their authority is invoked, to control the range of investigation in ascertaining what is to satisfy the requirements of the public interest in relation to the needs of vast regions and sometimes the whole nation in the enjoyment of facilities for transportation, communication and other essential public services." Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 142–143,[10] 60 S.Ct. 437, 441, 84 L.Ed. 656.

The Commission's role is not merely that of a referee in an adversary proceeding, who scores points only upon issues selected by the individual contestants and gives the decision to the highest scorer. While this might assure a "right" decision between the contestants, it does not assure a "right" decision in the public interest.[11] The latter decision requires exploration and evaluation of

6. Multiple Ownership, F.C.C. Report and Order, 18 Fed.Reg. 7796, 7797 (1953), citing Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L. Ed. 869, 1037.

7. See United States v. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; Democrat Printing Co. v. Federal Communications Comm., 1952, 91 U.S.App.D.C. 72, 78, 202 F.2d 298, 303.

8. 66 Stat. 720, 47 U.S.C.A. § 405.

9. 66 Stat. 715, 47 U.S.C.A. § 309(b) and (c).

10. This distinction between the judicial and administrative process has been discussed by the commentators. See Landis, The Administrative Process 34–46 (1938); Davis, Administrative Law 476–83 (1951).

11. In the administrative process "it is imperative that controversies be decided as 'rightly' as possible, independently of the formal record the parties themselves produce. The ultimate test of the administrative is the policy that it formulates; not the fairness as between the parties or the disposition of a controversy on a record of their own making." Landis, The Administrative Process 39 (1938).

factors vital to such interest, whether or not they have been raised by the parties.[12] Any other view would make the Commission's role dependent upon applicants who wish to avoid resolution of issues which, though relevant to the public interest, may reflect adversely on both.[13] It would relegate the Commission to the role of a "traffic officer," without power to protect the "interest of the listening public in 'the larger and more effective use of radio'." [14]

There is dictum in Johnston Broadcasting Co. v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 40, 46–47, 175 F.2d 351, 357–58, which lends support to the restrictive view of the Commission's role. That case, however, did not involve a failure of the Commission to consider an issue not raised by the contesting applicants. In any event, this dictum cannot be applied where, as here, a basic policy issue under the Act is involved.

In exercising our equity powers to review Commission action, this court, like the Commission, should be mindful of the public interest criterion which the statute prescribes as a condition precedent to a grant. Until we are satisfied that this criterion has been properly applied in this case, by a comparison of Pinellas and Tribune on the diversification issue and a conclusion thereon, we should not affirm. I would, therefore, remand the cause to enable the Commission to make this comparison and reevaluate its decision prior to our review.[15]

12. "A regulatory agency has an affirmative duty to carry out a program, to protect a public interest which frequently is otherwise unrepresented. When parties fail to produce needed facts, the regulatory agency typically must take the initiative in aggressively making its own factual investigation." Davis, Administrative Law 476 (1951).

13. Suppose, for example, that both of two mutually exclusive applicants had extensive newspaper and radio affiliations, e. g., comparable to those outlined in Clarksburg Publishing Co. v. Federal Communications Comm., 1955, 96 U.S.

App.D.C. 211, 225 F.2d 511, 518. Would the Commission be free to disregard these affiliations simply because neither party saw fit to raise the diversification issue?

14. National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 215–216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344.

15. 66 Stat. 720, 47 U.S.C.A. § 402(h); Fleming v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 223, 225 F.2d 523, 526.