**ATLANTIC SEABOARD CORPORATION, Home Gas Company, Kentucky Gas Transmission Corporation, the Manufacturers Light and Heat Company, the Ohio Fuel Gas Company, United Fuel Gas Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Lynchburg Gas Company, United Gas Improvement Company, Washington Gas Light Company, Commonwealth Natural Gas Company, Dayton Light and Power Company, Intervenors.**

No. 21409.

United States Court of Appeals District of Columbia Circuit.

Argued May 13, 1968.

Decided Sept. 27, 1968.

Mr. John F. Sisson, New York City, with whom Messrs. Richard A. Rosan, New York City, William C. Hart, Washington, D. C., and Edward S. Pinney, New York City, were on the brief, for petitioners.

Mr. Peter H. Schiff, Solicitor, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, Abraham R. Spalter, Asst. General Counsel, and Joseph J. Klovekorn, Attorney, Federal Power Commission, were on the brief, for respondent.

Mr. Karl Michelet, Washington, D. C., Attorney for intervenor, Washington Gas Light Company, argued on behalf of all intervenors.

Messrs. James O. Watts, Jr., Lynchburg, Va., Stanley M. Morley, J. David Mann, Jr., and C. Oscar Berry, Washington, D. C., were on the joint brief for intervenors, Commonwealth Natural Gas Co., Lynchburg Gas Co., The United Gas Improvement Co. and Washington Gas Light Co.

Mr. Julian De Bruyn Kops, Dayton, Ohio, was on the brief for intervenor, The Dayton Light and Power Co.

Mr. Robert A. Peavy, Washington, D. C., entered an appearance for intervenor, United Gas Improvement Co.

Mr. Kirk W. Weinert, Washington, D. C., entered an appearance for intervenor, Lynchburg Gas Co.

Before FAHY, Senior Circuit Judge, and BURGER and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is a petition for review of a Federal Power Commission order (Opinion No. 523, 38 FPC 91) in proceedings before the Commission on remand from this court in Lynchburg Gas Co. v. FPC, 119 U.S.App.D.C. 23, 336 F. 2d 942 (1964). In *Lynchburg* the court set aside, for lack of evidence and subsidiary findings supporting the Commission's action, the Commission's order authorizing Atlantic Seaboard, a pipeline affiliate of the Columbia Gas system, to impose a special "partial requirements" rate schedule (PR rates). The PR rates apply only to partial requirements customers, i. e., a customer that obtains gas both from Seaboard and from some other natural gas supplier, and requires such a customer to pay for a minimum volume of gas, both monthly and annually, regardless of whether the gas is used. The minimum purchases so required are determined by application of a formula derived from the customer's percentage usage of its contracted demand from Atlantic Seaboard [1] in a base period prior

1. Rates in the natural gas transmission industry are usually two-part. There is a demand charge, the right to take daily a certain volume of gas specified in the contract, and there is a commodity rate, for the gas actually taken. A pipeline

to its having obtained a second supplier of natural gas.[2] The purpose of these PR rates is plain: to restrain the customer from shifting its purchase from its historic supplier to a certified second supplier to the full extent otherwise dictated by the relative costs of gas.

The Commission's original 1962 opinion[3] stated that Atlantic Seaboard and the other Columbia Gas subsidiaries[4] needed these rates to protect them against "deterioration of sales," and that the system's full requirements customers should be protected "from being required to pay the higher rates which may result from the deterioration of some of Columbia's markets." The full requirements customers might need protection because not all of Columbia's fixed costs are recovered by the demand charges. Some fixed costs are recovered by the commodity rate.[5] Therefore, that part of the pipeline's fixed costs that would have been recovered by higher sales to partial requirements customers will now be spread instead among the continuing purchases, to the economic detriment of the full requirements customers.

In remanding, this court pointed out that the record evidence did not show how many of the Columbia companies' full requirements customers lacked access to a second source or supply; nor did it refute the possibility that any lost sales to partial requirements customers could be made up by sales to other customers, thereby leaving the net market unchanged[6] and rendering higher rates unnecessary.

On the remand, the Hearing Examiner on his own initiative limited the proceedings to the threshold question whether there was any need whatever for partial requirements rates. The burden of showing a necessity for them was placed on Atlantic Seaboard and the other Columbia companies affected. After hearing extensive evidence from the companies, the Examiner ruled that no such necessity had been demonstrated. In part, his conclusion rested on the fact that Columbia had recently filed restructured tariffs with the Commission— which have since been approved—designed to make the Columbia companies more competitive and to encourage growth of high load factor sales. These tariffs lower the commodity rate and

---

customer's "load factor" is its percentage usage of its contract demand volume. Under the two-part rate the higher the load factor the lower the unit cost to the customer. To avoid high costs of idle facilities, it is important for the system as a whole to keep high load factors. This puts a premium on obtaining "base load" sales—those year-round sales, not dependent on the variable winter heating market, which are statistically predictable and made at high load factors.

2. The base period is the two year period prior to certification of competition.

3. Opinion No. 368, 28 FPC 860 (1962).

4. Kentucky Gas Transmission Corp., Home Gas Co., The Manufacturers Light and Heat Co., along with Atlantic Seaboard, had filed PR rates for Commission approval under § 4(d) of the Natural Gas Act, 15 U.S.C. § 717c(d). On remand, proceedings concerning subsequently filed PR rates of Ohio Fuel Gas Co. and United Fuel Gas Co. were consolidated. All of these companies are subsidiaries of the Columbia Gas System,

Inc. (Columbia), and collectively they are referred to herein as the Columbia companies. For purposes of this case, decided on a threshold issue, slight variations in their respective rates are irrelevant.

5. See, note 1, supra. Insofar as fixed costs are allocated to the commodity charge, it tends to spread those costs on to the system's high volume users.

6. Such a balancing out effect is also dependent on other factors, e.g. whether the off-setting sales are "base load" sales, taken at high load factors, or merely "peaking" service. Peaking sales are taken at low load factors, and hence are not an adequate substitute for lost base load. Also relevant is whether the increased sales themselves require additional construction, and hence increased fixed costs, and that may turn on matters such as geographic location of the replacement sales. However, on the record in this case, we need not be concerned with limitations on the usefulness of a "net market" position concept in this industry.

reflect a substantial reduction in the amount of fixed costs allocated to the commodity part of the rates, thus reducing the impact of lost commodity sales on full requirements customers.[7]

The Commission upheld the Hearing Examiner's decision. It did not rule out the possibility that "after more experience under its restructured tariff Columbia will be able to design and justify whatever minimum commodity rate, if any, such experience shows to be necessary and desirable." It held merely that Columbia had not provided substantial evidence of its need for such a rate, a burden properly imposed on the rate's proponent. Thus its evidence mainly showed diversions under the old tariffs and was not germane to what could be expected under the new rates. The Commission further stated that Columbia had presented no showing of net loss of base load sales, and that its argument that growth based on peaking service and storage does not serve to offset loss of base load sales was beside the point. At best the evidence showed that the absence of a PR rate might result in a lower growth rate for base load sales than for peaking service, and the Commission held that this was not enough to justify the proposed PR rate.

We turn now to a discussion of the guiding principles that we consider applicable to this case—which arises this time on the petition of Atlantic Seaboard and the other Columbia companies, rather than the consumers—to set aside the Commission's action.

From the preceding statement of the background it is apparent that the Commission's holding was narrowly confined: it did not set forth broad rules to govern these difficult questions of pipeline competition; it merely held that the limited evidence put forward by Columbia, not tested by experience under recently restructured tariffs themselves designed to make shifts of pipeline suppliers unnecessary and uneconomical,[8] at best showing slower growth rates of base load sales, did not justify these partial requirements rates. It also held that there was not yet sufficient experience under the restructured rates to permit the Commission's staff to suggest some other form of minimum commodity provision.

2. Petitioners contend that in making this determination the Commission felt itelf bound to apply as "law of the case" a "net market loss" test fashioned by this court's opinion in *Lynchburg*: namely that no PR rates could be justified unless it were established that the Columbia companies' losses to newly certificated competition would not be made up by increased sales elsewhere. Petitioners further contend that this court had no intention of imposing such a test on the agency by its opinion in *Lynchburg*, and that, if it did, such a judicial imposition of standards would be contrary to well-settled limits on the scope of judicial review of agency exercise of administrative discretion. FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (D.C., 1940); FPC v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (D.C., 1952).

With the latter two contentions, we are entirely in accord. Problems of inter-pipeline competition are emerging as important substantive questions requiring application of the Commission's expertise.[9] The considerations

---

7. The most dramatic example is the case of Atlantic Seaboard. At the time of *Lynchburg*, roughly half of Seaboard's fixed costs were recovered by the commodity rate. After the revision, only 6% was recovered through that rate. By increasing storage facilities so that high winter sales may be taken during low summer demand periods, the companies have also acted to raise load factors.

8. Of course, the drop in the commodity rates—to reflect the removal of large amounts of fixed costs—has meant a concomitant increase in the demand charge.

9. For discussion see article by former Chairman Nelson L. Smith, The Federal Power Commission and Pipeline Markets: How Much Competition?, 68 Colum.L.Rev. 664 (1968).

are complex and competing. The high fixed costs and immobility of pipeline facilities are economic characteristics of the natural gas industry precluding the sort of competition expected as -a norm elsewhere in the economy. However, the Commission may properly look to the existence of some competition, even if entry is limited by legal barriers and regulatory necessity, as an important and effective tool in increasing economic efficiency and quality of service. A primary goal of the Natural Gas Act is cheap gas for the ultimate consumer.[10] A cross-current appears when cheap gas to one group of consumers results in higher prices to another. The extent of this impact will vary depending on innumerable factors, the very reason why the determination of standards is properly for the Commission in the exercise of its regulatory expertise, and not for the courts. Indeed as we have recently noted, fair apportionment of burdens among a utility's varied customers is a problem in many ways more complex and challenging than the question of fair return.

*Lynchburg's* "net market loss" test was not intended to bind the Commission in its consideration of the nature and extent of economic consequences that may warrant protection of a historical supplier, and full requirements customers dependent on it, from the impact of competition, from a second source of supply—from competition that the Commission must determine serves the public interest.[11] As the Columbia companies point out, in economic terms "net market loss" cannot be a decisive test, since the historic suppliers may be hurt in an economic sense by loss of historical sales regardless of whether their growth in other sales brings them back to the precompetitive level.[12] Undoubtedly loss of growth confronts a company with economic disadvantage.

The point is, however, that a policy favoring effective competition necessarily brings with it the reality of economic pinch, present or threatened. The presence of a second seller means that the historic supplier loses out on sales it would have otherwise had—assuming the same ardor in promoting sales in a noncompetitive setting. It is through the enhanced efforts made by the supplier in response to such pressure that competi-

---

10. FPC v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944). It is settled that antitrust considerations are relevant, and must be considered by the Commission in the performance of its duties under the Natural Gas Act, People of State of California v. FPC, 369 U.S. 482, 484–485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956); Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. —, 399 F.2d 953 (1968). For one example of the benefits to consumers of some competition, even in a generally regulated area, see United States v. El Paso Natural Gas Co., 376 U.S. 651, 655, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), where the Court noted that El Paso reduced its prices some 25% when faced with the prospect of competition.

11. All new facilities must be certified by the Commission under § 7 of the Act, 15 U.S.C. § 717f, to be in the public interest. Thus, the Columbia companies may intervene in any § 7 proceeding to open their markets to a second supplier to show that, in view of the impact on Columbia and its customers, this new competition would not be in the public interest. There is discretion in § 7 proceedings to issue certificates with conditions, and where the public interest requires it with price conditions. Atlantic Ref. Co. v. Public Serv. Comm'n (CATCO case), 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed. 2d 1312 (1959). In its original opinion, 28 FPC 860, set aside in *Lynchburg*, the Commission concluded that the public interest was better served by use of minimum commodity rates to protect the old market rather than by enlarging and delaying certification proceedings with detailed projections as to possibility of harm from the new supply.

12. Whether other sales may properly be viewed as offsetting is itself a difficult question requiring application of regulatory expertise. Two of the considerations are set forth in n. 6 *supra*. The Commission held, however, that the evidence put forward by Columbia did not permit an inference that Columbia's increased sales were not properly off-setting.

tion reaps its benefits. The hard problem then is not whether competition may hurt but rather where and how to draw the lines of acceptable range of competition and hurt, in response to the economic characteristics and interrelationships of the industry that require regulation in the first place.

In its 1962 opinion the Commission stated it was drawing lines based on protection of full requirements customers from deterioration of their pipeline suppliers' markets, thereby requiring an increase in rates. This court was obliged to remand because the record did not bear out the hypothesis of increase in rates. Nothing indicated whether other sales might not make up for the loss of contribution to fixed costs attributable to decline in commodity purchases by partial requirements customers. If the need for PR rates turns decisively on that consideration of increased rates, then the concept of "net market loss" has broader regulatory significance, particularly for regulation of an industry that is growing fast, and provides a meaningful concept to focus on the realistic possibility that substitute sales may effectively avoid the need for rate increase.[13] It was the Commission, not the court, that cast the need for protection in terms of avoiding rate increases. And of course the Commission may modify its doctrine [14] or even change its policy.[15]

Petitioners make the further point that there may be economic disadvantage not only to the supplier but also to the full requirements customers even if no rate increases are required. The point is, simply, that curtailment of sales to the partial requirements customers may keep the rates from being lowered. Full requirements customers and the consumers they serve, are denied the lower price of gas that would obtain if total usage were enhanced by insisting that the partial requirements customers maintain their historical load factor usage. That result may well follow.[16] However, it is often true of legal rules that they define the nature and extent of a protected interest, and compensate for the injury done to that interest, without regard to whether this corresponds to the exact economic injury sustained.[17] Just as competition may pinch the Columbia Gas System, so too may it pinch the full requirements customers tied to that system.

To recapitulate: the question is where the lines are to be drawn in defining the range of acceptable competition, remembering that the consequence of not permitting any competition is to force higher cost gas on partial requirements customers and the consumers they serve. All that *Lynchburg* held was that, given the Commission's statement as to the consequence of competition it deemed impermissible, its order was not justified by the evidence. *Lynchburg* does not forbid the Commission to change its criteria, and does not require—either in the context of devising minimum commodity provisions, or in the context of consider-

---

13. Several judicial decisions since *Lynchburg* have held that offsetting sales are a relevant consideration, *see* Cincinnati Gas & Elec. Co. v. FPC, 389 F.2d 272 (6th Cir. 1968) ; Atlantic Seaboard Corp. v. FPC, 397 F.2d 753 (4th Cir., 1968).

14. SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

15. City of Chicago v. FPC, 124 U.S.App. D.C. 13, 385 F.2d 629 (1967) ; Pinellas v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S. Ct. 650, 100 L.Ed. 869 (1956).

16. Whether this result will follow depends in part on whether the pipeline supplying the particular Columbia Company has idle capacity so that the higher purchases could have been supplied without the construction of new facilities, which would add to the fixed costs which must be covered.

17. *See, e.g.,* United Shoe Mach. Corp. v. Hanover Shoe, Inc., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), holding that a person paying higher prices because of violation of the antitrust laws is damaged to the extent of the overpayment regardless of whether it recouped that loss as a result of industry-wide price levels set to recover costs.

Compare the collateral source rule in torts cases.

ing certification of a second supplier [18]— that the historic supplier's "net market" position must be damaged or threatened to warrant protection of the supplier in the public interest. The task of determining what interests should be protected, and to what extent, is a policy matter for the agency, utilizing its expertise, to state, defend and apply, subject to the settled rules of judicial review according deference to its standards and applications insofar as they are supported by substantial evidence and are not inconsistent with the statute.

3. We return, in the light of this discussion, to petitioners' contention that the Commission's action reflects a misunderstanding of *Lynchburg*.

We begin by noting that it is impossible on the record made before the Hearing Examiner to determine how much the Columbia companies will be damaged in the absence of a PR rate by diversions due to presently certificated competition. The extent and consequences of these diversions—both on the Columbia companies and their full requirements customers—cannot fairly be ascertained because there has not been sufficient experience under the restructured tariffs filed by Columbia after the Commission reopened the PR proceedings for further evidence. As stated earlier, these new rates markedly reduce the commodity component of the rate schedule, narrowing the gap between Columbia and its competitors. Restrictions on boiler fuel usage were eliminated. New Winter Service schedules were established permitting summer nominations for winter delivery, and alleviating the purchaser's high cost of meeting winter peaks occasioned by the growth in space heating load. The increase in demand component of the tariff also makes low load factor use of the facilities more expensive. Even the dissenting Commissioner agreed that "this record hardly permits an adequate evaluation of Columbia's proposed partial requirements schedules." [19]

■ Therefore, on its face, the Commission's action, refusing to approve the proposed PR rates at this time, but leaving the question open for a time where there has been greater experience with the problem, has all the earmarks of sound administrative action: identifying a problem, deciding that the gas companies affected by it will not collapse by failing to settle it at once and for all time, and leaving the problem for application of administrative expertise when raised again in the light of more experience and more complete facts. Compare American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 359 F.2d 624 (en banc), cert. denied 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). That approach in this case still permits the Columbia companies to seek protection against future diversions by intervention in the certification proceeding authorizing competition.[20] Furthermore, the required funds for past collections under these rates is small.

It is against that setting that we must consider petitioners' claim that, because

18. The precondition to competition, see n. 11, *supra*.

19. Experience may show that Columbia can provide an appropriate tariff to meet its problems through use of an effective minimum commodity rate, applicable to all customers, and not merely those who have second suppliers.

20. The Examiner noted:
    Columbia intervened in the certificate proceeding involving service to Rockland and Central. Although it did not succeed in having the Commission deny the application, the Commission limited the service to be rendered by the alternative supplier, to the end of protect-

ing Home and its other customers. Tennessee Gas Transmission Co., 14 F.P.C. 544, 545. If Columbia feels that it was entitled to more relief than it obtained, perhaps the reason was that Columbia did not make a sufficiently strong showing. Upon an adequate showing by Columbia, the Commission, of course, could have denied the application of the alternative supplier. Or, in lieu of doing that, the Commission could have attached a condition to the certificate granted the alternative supplier which would have prohibited a change in the pattern of purchases from the Columbia company. (J.A. 237–238)

of a misunderstanding of *Lynchburg*, the Commission failed to exercise its expertise. In *Lynchburg* we held that no evidence other than mere speculation supported the Commission's application of its own substantive standards for justifying a PR rate. We did not challenge those standards. There is nothing to indicate that the Commission changed its position on the remand, as to what economic factors justify a PR rate. The Commission's opinion on remand states that the court in *Lynchburg* had "identified those substantive economic factors which usually justify a minimum commodity rate." That these usual factors reflect the Commission's requirements, and not the court's, is apparent from the fact that one of them—the minimum take-or-pay obligation which a pipeline has to its suppliers—is not even mentioned in the court's *Lynchburg* opinion.

■ The Commission's references to the *Lynchburg* opinion have sometimes been less than felicitous. For example, in denying rehearing in this case, (J.A. 356): "The court made it clear that a partial requirements tariff would require justification under the criteria which we explained in our opinion." Did the Commission mean that this court was mandating the retention of those criteria—in contravention of well-known principles of the function of a reviewing court? We think not. What we think was meant was that taking as given the criteria explained in the Commission's opinion, the court made it clear that the PR tariff required justification under those criteria. So it does, and so it should. And when and if the agency refines or changes its criteria, rate proposals will have to be justified under them. The nub of this case is that the Commission has held, correctly, that a line proposing a tariff with a requirements feature has a burden of justification. In this case it was held that Columbia had not met that burden as of this time, without prejudice to future application in the light of experience. We think this decision should be

Affirmed.