Herbert R. GIBSON, Jr., Gerald P. Gibson, Gibson's Inc., Gibson's Discount Centers, Inc., Ideal Travel Agency, Inc., Gibson Warehouse, Inc. and Gibson's Products Co., Inc., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

H. R. GIBSON, Sr., et al., Petitioner, v. FEDERAL TRADE COMMISSION, Respondent,

Nos. 80–1743, 80–1746.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1982.

Rehearing and Rehearing En Banc Denied Sept. 13, 1982.

Robert B. Bain, Dallas, Tex., Robert E. Rader, Jr., Ennis, Tex., for petitioners in No. 80–1743.

Bardwell D. Odum, Dallas, Tex., for petitioners in No. 80–1746.

Ernest Isenstadt, William A. E. Doying, F.T.C., Washington, D.C., for respondent.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

As the curtain rises, the Gibsons appear before us once more for what we hope will be the final act in this almost 15 year drama starring the Gibsons, masters of discount merchandising, and the Federal Trade Commission (FTC). Unlike the earli-

er scenes in this Court[1], this time we are to arrive at the merits as we review the FTC's final order enjoining the Gibson Petitioners from engaging in assorted trade practices. As the curtain falls, we affirm the order and direct enforcement.[2] No encores please.

## Setting the Stage

In 1958 H. R. Gibson Sr. and his wife Belva founded the first Gibson Discount Center in Abilene, Texas. From this beginning emerged a chain of over 500 retail discount stores operating in 29 states, and several small corporations providing certain support or related services to the retail stores. The scions of the family, H. R. Gibson, Jr., and Gerald P. Gibson, were actively involved in the family business, each owning interests in several of the retail stores, and eventually receiving the ownership interest of their parents.

## A Family Affair or Who's Minding the Store

The Gibson retail discount stores are generally incorporated individually and include not only family owned and operated stores but also stores licensed to use the Gibson name.[3] In the period 1969 to October 31, 1972, Gibson Sr., in addition to licensing various franchisees to use Gibson trade names in the operation of retail stores, operated a private trade show where manufacturers displayed their products to buyers for both Gibson-owned and franchised stores. During this same period, Gibson Sr. and his wife Belva were majority stockholders in several Gibson retail stores and held a minority interest in certain other retail stores. The store managers of the majority owned stores were hired by Gibson, Sr. who left the day-to-day operations largely to the store managers. During this same period, from 1969 to November 1, 1972, both Gibson sons owned retail stores.[4] The Gibson stores, family owned and franchised, collectively did approximately $1.6 billion in business in 1971.

On November 1, 1972, the Gibson businesses were reorganized so that Gibson, Sr. and his wife Belva disposed of their ownership interest in both the franchising and retailing aspects of the family business, transferring these to their two sons, Gibson, Jr. and Gerald Gibson. Gibson, Sr. sold the Gibson Products Company name to his sons and retained only the trade show business, registered as "The Gibson Trade Show". Gibson's, Inc., wholly owned by Gibson, Jr. and Gerald Gibson, was the corporate entity used to buy Gibson, Sr.'s retail business and continues to hold the stock of the retail stores. Gibson's Discount Centers, Inc., a subsidiary of Gibson's, Inc., actually carries on the retailing and franchise business.

Franchisees of the Gibson trade name are charged a monthly franchise fee and are subject to quality control by the franchisor.[5]

1. In two prior cases we affirmed enforcement of FTC subpoenas, once during the investigative stage, *FTC v. Gibson*, 460 F.2d 605 (5th Cir. 1972), and once following the subsequent issuance of an FTC complaint, *FTC v. Gibson Products of San Antonio, Inc.*, 569 F.2d 900 (5th Cir. 1978). While the parties in these two cases and the instant case are not absolutely identical, the actions all stem from the same FTC investigation.

2. "To the extent that the order of the Commission is affirmed, the Court shall thereby issue its own order commanding obedience to the terms of such order of the Commission." 15 U.S.C. § 45(c).

3. As of December 31, 1976, 43 retail stores were controlled by individual members of the Gibson family and 614 licensed stores were operated under the Gibson trade name. The licensees pay a monthly fee for the use of the Gibson trade name.

4. Gerald Gibson owned Gibson stores in Paris, Texas, Shreveport, Louisiana and Bruton Terrace in Dallas, Texas, as well as minority interest in stores in Pueblo, Colorado, Garland, Texas and Temple, Texas. H. R. Gibson, Jr. owned the majority of stock in stores in Hutchinson, Kansas and San Antonio, Texas, as well as owning some stock in stores located in Pueblo, Colorado, and the following cities in Texas: Richardson, Temple, Bruton Road in Dallas, Plano and Fort Worth.

5. The standard licensing contract of Gibson Discount Centers, Inc., the wholly owned subsidiary of Gibson's, Inc., in use since November 1, 1972, provides in part:

9. GIBSONS shall in connection with this Agreement render such assistance to LICEN-

Along with the use of the trade name, franchisees receive merchandising advice and most importantly are able to participate in the Gibson Trade Show.

## Tricks of the Trade

The Gibson Trade Show, an essential element in both the Gibson franchises and in the FTC complaint, is a private trade show produced by Gibson, Sr. The show, held approximately four times a year, is basically restricted to buyers for Gibson-owned and franchised stores. The show is the vehicle through which representatives of various suppliers can exhibit their products and attempt to obtain orders from various Gibson stores. A supplier or representative allowed booth space in the show in effect has authorization to sell his products to Gibson retailers but no guarantee that the franchisees will buy his products. Gibson, Sr. employs "merchandise managers" or "trade show buyers" to operate the show. The trade show buyers recruit manufacturers to participate in the show, discuss product lines, billing terms and prices with suppliers, and negotiate with suppliers to get the best possible deal on the products that are to be shown. These buyers basically determine what suppliers are allowed to participate in the show as well as what products can be displayed. An integral part of the trade show operation is the show sheet (an order form and price list) which is filled out by the buyer after negotiations and indicates the price and terms for each product. These sheets, which are the exclusive order form used at the shows, are headlined "Ship to Gibson Products Company," followed by blank lines for the address of a particular store. In addition, they contain a notation instructing manufacturers not to ship at prices higher than those listed or a deduction will be taken. In return for the privilege of participating in the trade show, suppliers pay for booth rental, related service fees and show fees. Show fees are generally based on a percentage of sales made at the Gibson Trade Show although some suppliers pay a flat fee. Suppliers who refused to pay show fees were generally not permitted to participate in the trade show.

## Prologue

Although the FTC made a cameo appearance as early as 1967 when it first began investigating the Gibsons, it was not until February 1975 that it obtained star billing by issuing a three-count complaint alleging violations of the Federal Trade Commission Act and the Robinson-Patman Act against several Gibson-owned corporations, Gibson, Sr., his wife, and sons, Herbert and Gerald. Count I charged the petitioners with inducing suppliers to pay promotional allowances in connection with the Gibson Trade Show which were not proportionately available to other customers of the suppliers, violating Section 5 of the FTC Act, 15 U.S.C. § 45(a). Count II, also alleging violation of Section 5, concerned the boycott of suppliers who did not grant the promotional allowances charged in Count I. This count focused on the experience of three different suppliers,

SEE in connection with the operation of his discount business as may be found appropriate by GIBSONS after request by LICENSEE, including advice as to merchandising and other business practices so as to enable the LICENSEE to benefit from the knowledge and experience of GIBSONS in the discount business.

10. LICENSEE agrees that GIBSONS retains the absolute, complete and final right of quality control over all products and items sold and over all services rendered by LICENSEE to customers of LICENSEE'S discount business and associated enterprises using the Service Marks and Trade Names licensed hereby to see that the high standards of GIBSONS DISCOUNT CENTERS throughout the United States of America are maintained and to protect the property rights of GIBSONS in the Service Marks and Trade Names set forth in Paragraph 1 hereof. The LICENSEE further agrees that if GIBSONS notifies LICENSEE that GIBSONS disapproves of the quality of products, items, or services sold or rendered in connection with sale of items or products in the discount business of LICENSEE, that LICENSEE will immediately discontinue the sale of such items, products and/or services, or will immediately improve such services so that they meet the standards of excellence maintained by GIBSONS

ALJ opinion, p. 27–28.

Toastmaster, Tucker Manufacturing Co., and Jeannette Glass Company. Count III alleged the payment of illegal brokerage in violation of Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c).[6] The focus of Count III was on brokerage paid to Gibson Sr. by two brokers, Barshell, Inc. and Al Cohen Associates, Inc., which successively represented Ray-O-Vac in sales to the Gibson stores.[7] After extensive pretrial proceedings and a ten-month trial, the ALJ issued a 235 page opinion, accompanied by a two and one-half page order. The ALJ dismissed Count I. Under Count II, the boycott of suppliers, the ALJ issued an order against all respondents except Gibson's, Inc. Under Count III, the ALJ issued an order only against Gibson, Sr.

Both parties appealed the ALJ's decision to the Commission. The Commission affirmed the dismissal of Count I. It extended the order as to Count II to include Gibson's, Inc., finding that the boycott continued after November 1, 1972 under the management of Gibson's, Inc. and that it was proper and necessary to include Gibson's, Inc. in the order as the successor to the operations of a corporation found to be guilty of unfair trade practices. As to Count III, the Commission extended the provisions of the order concerning illegal brokerage to all Gibson family and corporate respondents on the basis of their complete interdependence and common control during the period of the violations. The Commission's decision and accompanying order issued on April 30, 1980. The petitioners filed motions for reconsideration in mid-June 1980, challenging certain aspects of the order. In addition, the respondents argued that certain actions taken by the Commission during periods of allegedly lapsed appropriations violated the Antideficiency Act, 31 U.S.C. § 665(a), and thus required dismissal or remand of the case. The third ground for reconsideration, and the only one pursued beyond the Commission, is based on the alleged disqualification of the ALJ, von Brand, based on his earlier service as an attorney-advisor to former Commissioner MacIntyre. The petitioners allege that in light of the opinion of the Ninth Circuit in *Grolier, Inc. v. FTC*, 615 F.2d 1215 (9th Cir. 1980), von Brand should have been disqualified from serving as an ALJ and thus dismissal or remand of the case was necessary. The Commission issued a further opinion and order denying the majority of the relief sought.

### Another Opening, Another Show

In seeking to have the FTC order set aside the Gibsons raise several challenges, not only to the specific proceedings and order in their case, but to the general administrative system developed by the FTC. In addition, they contend there is insufficient evidence on both the Count II boycott charge and the Count III Robinson-Patman charge. Although the arguments in both cases, that against Gibson, Sr. and his wife and that against the Gibson sons and Gibson corporations, are, like their briefs, almost identical, the Gibson sons and corporations also maintain that there is no evidence to connect them, as opposed to Gibson, Sr., with the allegations.

For openers, the Gibsons lead with their weakest argument, contending the FTC system of prosecution-adjudication deprives

---

**6.** Section 2(c) provides:

 **(c) Payment or acceptance of commission, brokerage or other compensation.** It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid.

**7.** Barshell, Inc., originally charged in the FTC complaint, negotiated a consent settlement in 1976. Al Cohen Associates, Inc., charged solely in Count III, was dismissed by the ALJ after trial for failure by the FTC to prove the allegations of the complaint.

them of their right to a fair trial and due process. Specifically, the Gibsons challenge the role of the Commission in investigating, adjudicating and reviewing complaints. "The Commission not only votes the complaint, but it determines by its adjudicatory powers what constitutes 'unfair' practices under Section 5." The Gibsons also challenge the role of the FTC attorney who coordinated the investigation in the pre-complaint period and then later served as "complaint counsel". The ALJ, a former attorney-advisor to Commissioner MacIntyre, also figures in to the "can't win" system of the FTC. Continuing their attack, the Gibsons assert that they have been before the FTC for *13 years*, "awaiting this opportunity for a meaningful review by a fair and unbiased tribunal, a Court of Law." Finally, totally removed from any context, the Gibsons present a tirade against the use of consent orders in general, relying on the testimony before a Congressional subcommittee of Frederic Scherer, a Director of the Bureau of Economics of the *Federal Trade Commission.*

 The FTC, however, clearly holds the trump in this hand, relying first on the Commission's organic legislation providing for the Commission to issue administrative complaints and subsequently sit as an adjudicative body. Federal Trade Commission Act § 5(b), 15 U.S.C. § 45(b). The combination of investigative and judicial functions within an agency has been upheld against due process challenges, both in the context of the FTC and other agencies. *FTC v. Cinderella Career and Finishing Schools, Inc.,* 404 F.2d 1308, 1315 (D.C.Cir. 1968); *Pangburn v. CAB,* 311 F.2d 349, 356 (1st Cir. 1962); *FTC v. Cement Institute,* 333 U.S. 683, 700–03, 68 S.Ct. 793, 803–04, 92 L.Ed. 1010, 1035 (1948); *Withrow v. Larkin,* 421 U.S. 35, 51–56, 95 S.Ct. 1456, 1466–69, 43 L.Ed.2d 712, 726–28 (1975). Further, the participation of the staff attorney in both the investigation and subsequent prosecution of a case is clearly allowed under 5 U.S.C. § 554(d). Nor is there any merit to the Gibsons' contention that they were denied due process by the 13-year delay. First, although the initial decision to investigate the Gibsons occurred in 1967, the administrative complaint was not issued until 1975. Second, as the FTC points out, the delay must be credited in part to the Gibsons themselves. *See FTC v. Gibson Products of San Antonio, Inc.,* 569 F.2d 900 (5th Cir. 1978); *FTC v. Gibson,* 460 F.2d 605 (5th Cir. 1972). As to the argument that consent decrees are used for coercion, we find this point irrelevant since the Gibsons are not here seeking to be relieved of a consent order and have failed to indicate how this argument has any connection with the merits of their own case. Forcing the Gibsons to choose between consenting to an order or incurring the burdens and expenses of a defense is inherent in the adversary process and is basically "part of the social burden of living under government." *FTC v. Standard Oil Co.,* 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416, 427 (1980), quoting *Petroleum Exploration, Inc. v. Public Service Commission,* 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938).

### Changing Roles—From Understudy to Lead

With the FTC taking the first trick, the Gibsons next present their strongest and longest argument, that concerning the qualification of the ALJ in light of his prior service as attorney-advisor to an FTC Commissioner.

The Gibsons' chief argument as to the administrative process concerns Theodor von Brand's metamorphosis from attorney-advisor to administrative law judge. Von Brand had served previously from 1963 through January 1971 as an attorney-advisor to former Commissioner Everett MacIntyre. In February 1977, at a prehearing conference, von Brand apprised counsel for the Gibsons of his prior service with Commissioner MacIntyre. In a discussion off the record, as to which there is no real difference of view, von Brand indicated he had no recollection of anything having come across his desk while serving as an attorney-advisor concerning the Gibsons and determined that the Gibsons had no objection to his continuing to serve as the ALJ in this

case. Then, to avoid any future problem, von Brand specifically put the following in the record.

> Judge von Brand: All right. The first thing I want to raise is something that I have raised off the record. I have informed counsel that in the period 1963 to 1970 I was legal advisor to Commissioner MacIntyre.
>
> Now, it is my understanding that none of the respondents in this proceeding would raise an objection to my continuing in this case on that ground.
>
> Is that correct, Mr. Odom [attorney for Gibson, Sr. and Belva Gibson]?
>
> Mr. Odom: That's correct as far as I'm concerned, yes, sir.
>
> \* \* \* \* \* \*
>
> Mr. Raider [attorney for Gibson sons and corporations]: That's correct, Your Honor.

Subsequently, von Brand presided over the ten-month trial, during which no objection was raised concerning von Brand's qualification. On February 26, 1979, von Brand issued his initial decision and order. This decision was appealed to the Commission which issued a decision and order on April 30, 1980. Not until June 12, 1980 did the Gibsons seek von Brand's disqualification, in a petition for reconsideration of the Commission's order. The Commission, in an order of August 8, 1980, refused this relief. The basis for the Commission's decision was threefold: (1) failure by the Gibsons to file a disqualification motion and supporting affidavits as required by the Commission's rule § 3.42(g)(2), 16 C.F.R. § 3.42(g)(2); (2) failure to file a timely objection; (3) no demonstration or assertion of prejudice. In its opinion, the Commission devoted substantial attention to the Ninth Circuit opinion in *Grolier, Inc. v. FTC,* 615 F.2d 1215 (9th Cir. 1980), discussed in more detail below.

The Gibsons' primary argument is that Section 5 of the Administrative Procedure Act (APA), 5 U.S.C. § 554(d),[8] by prohibiting an "employee or agent" from performing "investigative or prosecuting functions" and also participating or advising in the decision, places on the adjudicative process limitations which are essentially jurisdictional, and in addition, cannot be waived. The Gibsons contend that an attorney-advisor, as opposed to a Commissioner, is not exempt from the disqualification by 5 U.S.C. § 554(d)(2)(C). To the Gibsons, the basic concern of § 554(d) is the public interest in fairness, an interest that may not be waived. The Gibsons assert that their right to insist upon the disqualification of von Brand is "secondary to the public interest." Finally, in response to any criticism of the Gibsons' delay in raising this issue, they maintain that the right of disqualification was not apparent until the Ninth Circuit decision in *Grolier, supra.*

### Taking a Cue from the Ninth

The *Grolier* case, so heavily relied upon by the Gibsons, actually involved the same

---

**8.** Section 554(d) provides:

(d) The employee who presides at the reception of evidence pursuant to section 556 of this title [5 USCS § 556] shall make the recommended decision or initial decision required by section 557 of this title [5 USCS § 557], unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

*An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title [5 USCS § 557], except as witness or counsel in public proceedings. This subsection does not apply—*

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) *to the agency or a member or members of the body comprising the agency.*

(emphasis added).

ALJ. ALJ von Brand had served as an attorney-advisor to Commissioner MacIntyre during the period when Grolier was intermittently investigated and charged by the FTC. Records indicated that Commissioner MacIntyre had attended at least one meeting between Grolier and the representatives of the FTC. Grolier, upon learning of ALJ von Brand's prior service to Commissioner MacIntyre, requested that the ALJ disqualify himself from further participation in the proceedings. Von Brand denied the request, stating that he did not recall working on matters involving Grolier while serving as a legal advisor. Grolier then filed a formal motion for disqualification and removal of the ALJ with the FTC and requested that the FTC permit discovery of certain FTC records which might reveal the nature and extent of the ALJ's contact with the Grolier case. Both the requested discovery and the motion for disqualification were denied by the FTC. In its petition for review in the Ninth Circuit, Grolier argued that the failure to disqualify ALJ von Brand violated both § 554(d) of the APA and the Due Process guarantee of the Fifth Amendment. Grolier also alleged error by the FTC in denying the requested discovery.

The Ninth Circuit, in an opinion issued January 24, 1980 as amended on denial of rehearing April 17, 1980, determined that the exemption under 5 U.S.C. § 554(d)(2)(C) did not apply to ALJ von Brand once he was no longer an attorney-advisor. The Court specifically rejected the *per se* disqualification argument of Grolier that the ALJ was chargeable with knowledge of all investigative and prosecutorial activities undertaken by the FTC during his tenure as an attorney-advisor. In adopting a test focusing on the activity of the ALJ at the time that he served as an attorney-advisor, the Ninth Circuit indicated that disqualification was necessary only if the ALJ "was sufficiently involved with the case to be

apprised of *ex parte* information, . . ." *Grolier*, 615 F.2d at 1221. The Court also placed the burden of showing the ALJ's prior acquaintance with *ex parte* information on Grolier, the party challenging the qualification of the ALJ. After determining that the FTC wrongly concluded that attorney-advisors do not perform "investigative or prosecuting functions" within the meaning of § 554(d), the Ninth Circuit remanded the case to the FTC for reconsideration of the denial of discovery and in light of the results of that reconsideration, the disqualification motion. The Court very clearly indicated that the FTC did not necessarily have to grant discovery but it could not simply rely on a flat refusal to disclose anything concerning von .Brand's involvement. The Court suggested that the FTC might initially respond through affidavits concerning the extent of von Brand's involvement with the *Grolier* case while he served as attorney-advisor.[9]

The FTC's primary argument is that the Gibsons expressly waived the claim for disqualification during the pretrial proceedings and did not timely renew any claim. In addition, the FTC distinguishes the *Grolier* case on the facts. In *Grolier* there was no express waiver of von Brand's continuing to preside. Grolier specifically objected to the ALJ's participation and filed a motion to disqualify the ALJ prior to the Commission's decision. Nor does the FTC believe that the statutory separation of functions requirement cannot be waived. Rather, the FTC contends that the Gibsons' decision not to raise the issue of the ALJ's disqualification in its appeal to the Commission or prior to the issuance of the Commission's opinion was a calculated litigation decision, one which paid off in part since von Brand in his initial decision dismissed the principal charge in the complaint. The rationale supporting the waiver of this technical procedural requirement is analogous to the rule imposed on litigants that

**9.** The Ninth Circuit specifically did not reach the due process claim of Grolier, indicating that if von Brand is qualified, a more adequate record might be developed for the Court's determination of the due process claim.

Upon remand, the Commission denied the motion to disqualify von Brand and subsequently reissued its final order with modifications on March 9, 1982.

points of error will not be considered for the first time on appeal unless manifest injustice will result. To the FTC there is nothing unfair in holding a party to an express, knowing waiver.

Prior to the Ninth Circuit opinion in *Grolier*, the FTC took the position that § 554(d) did not apply to former attorney-advisors since they did not perform investigative or prosecutorial functions within the meaning of that section. In reaching such an outcome, the FTC focused upon the Congressional desire to prevent adjudication by those who had developed a "will to win." *In re Grolier, Inc.*, 87 F.T.C. 179 (1976). In reversing the FTC decision, the Ninth Circuit found an "equally important Congressional desire to prevent adjudicative interpretation of *ex parte* facts." *Grolier*, 615 F.2d at 1220 n.5. The Ninth Circuit, while rejecting the FTC position that § 554(d) was not applicable to the situation, specifically refused to accept the position here urged by the Gibsons that the ALJ was chargeable with knowledge of all investigative and prosecutorial activities undertaken by the FTC during his tenure as an attorney-advisor. *Grolier*, 615 F.2d at 1221. It is obvious from the decision that the Ninth Circuit did not view the situation as fundamentally unfair or jurisdictionally void since it refused a *per se* disqualification rule, choosing rather to remand the case to determine whether Grolier could meet the burden of showing that von Brand had prior acquaintance with *ex parte* information. Thus the Ninth Circuit opinion in no way forecloses the possibility of waiver, a concept wholly compatible with placing the burden of establishing prior knowledge on the proponent. Without rejecting the opinion of the Ninth Circuit in *Grolier*, there is a clear distinction. In the *Grolier* case, Grolier clearly and vigorously raised the issue of von Brand's participation in a timely manner, both before the ALJ and the FTC. This is a far cry from the Gibsons' express waiver of any objection to von Brand's continuation in the case after the ALJ's candid revelation of the facts.

## The Waive of the Past

■ We may agree, without deciding, that § 554(d) applies to the situation of an attorney-advisor who subsequently serves as an ALJ. We do this because we hold that the Gibsons—with explicit awareness of the facts or at least of the facts indicating the necessity for further factual inquiry open to them under FTC rules—expressly waived any objection they might have. Not only did the Gibsons clearly indicate that they had no objection to von Brand continuing to preside in their case, they failed to raise at any meaningful point or in any meaningful way the issue of disqualification. Subsequent to the ALJ's opinion, the Gibsons in their appeal to the Commission did not mention the issue of disqualification. Nor did they mention it at oral argument on the appeal or once the case was under advisement by the Commission. Even after the Ninth Circuit issued its opinion in *Grolier*, the Gibsons failed to direct the Commission's attention to this case or to raise this issue. Only after the Commission had issued its decision, one less favorable to the Gibsons than that of the ALJ, did the Gibsons indicate any objection to the ALJ's participation. If the Gibsons objected to von Brand's participation, at the minimum they should have preserved this objection three years earlier when they were asked specifically by the ALJ if they objected to his continued participation.

■ Nor can we accept the Gibsons' argument that they were under no duty to raise the issue since the FTC had indicated in its *Grolier* decision that disqualification was not necessary. Because the Gibsons expressly waived any objection, they are in no position to argue that a challenge to the ALJ's participation would have been fruitless. A party in an administrative proceeding, as in litigation in a court, has the duty and responsibility to bring to the attention of the agency an objection so that the agency has the opportunity to reconsider its position. This is no different than our requirement that a party provide the lower court with the opportunity to correct its errors by pointing out those errors to the

District Judge first. It is certainly conceivable that von Brand would have recused himself in the case which had not yet gotten under way or that the FTC, if presented with other arguments, might have reconsidered its position in *Grolier*.

Nor are we convinced by the Gibsons' argument that they were afraid to raise the issue of von Brand's participation for fear of antagonizing the ALJ. Counsel for Gibson, Sr. would have us believe that his reticence was based on his personal familiarity with the *Grolier* case, hearings on which were also being held in the Dallas FTC offices at the same time. We are not persuaded. Counsel for Grolier obviously harbored no such fear, filing timely an objection to von Brand's participation. Even if we were to acquiesce in this excuse for failing to raise the issue before von Brand, this argument offers no succor for the Gibsons' failure to raise the issue subsequently before the Commission. Certainly the Gibsons did not hesitate to contest the ALJ's opinion in other aspects, objections which called into question prior opinions of the FTC in other areas. Rather we are presented with a situation where, due to the fortuitous intervening decision of the Ninth Circuit in *Grolier*, the Gibsons are now able to advance, retrospectively, an argument for disqualification of the ALJ. They are, however, unable to convince us of the applicability of *Grolier* to an express waiver of the kind involved here. The attempted end run around the need for timely objection through the argument of a situation analogous to exhaustion of remedies provides no yardage. While the Gibsons rely on *Board of Education v. Harris*, 622 F.2d 599 (2d Cir. 1979), *cert. denied sub nom., Hufstedler v. Board of Education*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981), that case specifically distinguishes the issue of exhaustion from waiver of objection.

Case law supports the concept of timely objection with its complementary notion of waiver within the context of disqualification under § 554(d). In *International Paper Co. v. Federal Power Commission*, 438 F.2d 1349 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971), the Second Circuit, in considering alleged violations of due process and § 554(d) based on the participation of the general counsel and other FPC employees in both prosecutorial and decision making functions, found a waiver from the failure of a party to object timely.

Appellant made no timely challenge to this purported practice nor did counsel call it to the attention of the Commission at the time the stipulation of facts agreed to had been reviewed and approved by the Assistant General Counsel and General Counsel, before the supposed error was committed. This knowing inaction and calculated lying in wait, taken with the hope of upsetting a future adverse decision of the Commission, constituted a waiver of appellant's rights.

438 F.2d at 1357. The D.C. Circuit in *Democrat Printing Co. v. FCC*, 202 F.2d 298 (D.C.Cir.1952) also found a waiver from the failure to raise a timely objection.

Aside from these specific interpretations of § 554(d), the requirement for filing of a timely objection finds support in the language of § 556(b) of the APA which provides: "On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case." The Ninth Circuit, in considering a motion of disqualification based on bias on the part·of a Commissioner, in *Safeway Stores, Inc. v. FTC*, 366 F.2d 795, 802 (9th Cir. 1966), *cert. denied*, 386 U.S. 932, 87 S.Ct. 954, 17 L.Ed.2d 805 (1967), found that a motion was not timely where the objecting party had been silent during trial, briefing, and argument to the Commission and had only raised the argument several months after the Commission issued an unfavorable decision. In *Marcus v. Director, Office of Workers' Compensation Programs*, 548 F.2d 1044, 1050–51 (D.C.Cir.1976), the D.C. Circuit, while indicating that disqualification under § 554(d) is mandatory, also stated:

The general rule governing disqualification, normally applicable to the federal

judiciary and administrative agencies alike, requires that such a claim be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist. It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process. The APA-mandated procedures afford every party ample opportunity to enforce and preserve its due process rights.

548 F.2d at 1051 (footnotes omitted). *See also Capitol Transportation, Inc. v. United States,* 612 F.2d 1312, 1325 (1st Cir. 1979) (claim of bias on part of ALJ first raised on petition for reconsideration after final order of agency).

The Commission, in denying the Gibsons' motion for reconsideration, indicated that disqualification claims must be raised as soon as practicable and cited several cases in support. In addition, the Commission relied on its Rule of Practice § 3.42(g)(2) governing the filing of disqualification motions.[10] The motion and supporting affidavits must set forth the grounds for disqualification. The ALJ has ten days within

which to disqualify himself. Should he not do so, he must certify the motion to the Commission which must determine promptly the validity of the claim. As the Commission indicated in its denial of the Gibsons' motion for reconsideration:

> The requirement of affidavits [under Rules of Practice § 3.42(g)], grounded in 5 U.S.C. § 556 (1976), is not an empty formality to be cast aside unilaterally by a party to a Commission proceeding. There are many reasons for such a requirement. An affidavit provides an exact, sworn recitation of facts, collected in one place; a disqualification motion must not be made by a party, nor taken by the Commission, lightly.... Accordingly, the affidavit requirement serves not only to focus the facts underlying the charge, but to foster an atmosphere of solemnity commensurate with the gravity of the claim. Respondents' failure to submit affidavits is thus an independently sufficient basis to deny their petitions in this respect.

■ This Court has implied a timeliness requirement within the context of disqualification claims in an analogous situation, that concerning judicial disqualification under 28 U.S.C. § 455.[11] In *Delesdernier v.*

---

**10.** Rule of Practice § 3.42(g)(2) as in effect at the time provides:

> (g) *Disqualification of administrative law judges.*
>
> \* \* \* \* \* \*
>
> (2) Whenever any party shall deem the Administrative Law Judge for any reason to be disqualified to preside, or to continue to preside, in a particular proceeding, such party may file with the Secretary a motion addressed to the Administrative Law Judge to disqualify and remove him, such motion to be supported by affidavits setting forth the alleged grounds for disqualification. If the Administrative Law Judge does not disqualify himself within ten (10) days, he shall certify the motion to the Commission, together with any statement he may wish to have considered by the Commission. The Commission shall promptly determine the validity of the grounds alleged, either directly or on the report of another Administrative Law Judge appointed to conduct a hearing for that purpose.

**11.** Section 455 provides:

> **§ 455. Disqualification of justice, judge, or magistrate**
> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> (2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
> (3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

*Porterie*, 666 F.2d 116 (5th Cir. 1982), we found that a motion to disqualify raised for the first time on appeal after two full trials on the merits was too tardy to consider. Looking to the policies underlying the disqualification of judges statute, we stated:

> If disqualification may be raised at any time, a lawyer is then encouraged to delay making a § 455(a) motion as long as possible if he believes that there is any chance that he will win at trial. If he loses, he can always claim the judge was disqualified and get a new trial. This result would not comport well with the purposes behind § 455(a). . . . Lack of a timeliness requirement encourages speculation and converts the serious and laudatory business of ensuring judicial fairness into a mere litigation stratagem.

666 F.2d at 121. *See also In re International Business Machines Corp.*, 618 F.2d 923, 932 (2d Cir. 1980); *United States v. Conforte*, 624 F.2d 869, 879–80 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *Marcus, supra*, and cases cited therein at n.21; *Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512, 515–16 (4th Cir. 1974). The same policies supporting timely objection or motions to disqualify judges are equally applicable to administrative law judges. A party should not be able to manipulate the rules by the use of an express waiver only to attempt later to avoid the effects of this waiver. Granted, as the Gibsons assert, "[w]hat is as stake here is not so much the right of an individual FTC Respondent . . . but the public interest, the confidence of the public in the fairness of the adjudicative system of the FTC, and the entire administrative action of the FTC," we must emphasize that the public has an interest as well in conserving judicial and quasi-judi-

cial resources and in ensuring the integrity of adjudicative process. Allowing a party to waive expressly an objection and then later seek to avoid it undermines the integrity and finality of administrative procedures.

■ Finally, there is simply no indication of any manifest injustice or prejudice to the Gibsons from the participation of ALJ von Brand. The Commission, in denying the Gibsons' motion for reconsideration, also indicated that the Gibsons had not demonstrated or even asserted any prejudice, stating:

> "[O]ur review of the record convinces us that Judge von Brand was impartial in every respect, that his decision was thoroughly researched, and that his meticulous findings and conclusions were firmly and exclusively based on the record evidence. Of course, to the extent respondents challenged Judge von Brand's findings, conclusions, and proposed order, we undertook an exhaustive, independent review. In that review, we did not find that issues of demeanor or discretion were especially important in the determination of the case; thus, even if it were to be determined that Judge von Brand was disqualified, our decision of April 30, 1980 would not be void, as respondents have neither demonstrated nor suggested actual prejudice from his presiding, and we perceive none.

The lack of prejudice seems clear from the fact that the transactions forming the basis for liability challenged here occurred after 1971 when von Brand left the service of Commissioner MacIntyre. The only charge that could possibly rely on ex parte information, that in Count I, was dismissed by the ALJ. Nor have the Gibsons provided or even suggested the existence of any evi-

---

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) Is acting as a lawyer in the proceeding;
(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
(iv) Is to the judge's knowledge *likely to be* a material witness in the proceeding.

dence that von Brand either possessed or relied on ex parte information. Unlike *Grolier*, the Gibsons did not even request discovery of what information ALJ von Brand would have had available to him, choosing instead to rely on the unsupported position that "It is accepted that the attorney-advisor ... is fully chargeable with whatever knowledge the Commissioner ... had of the Gibson pre-complaint matters before the Commission." The only support for this position is a quote from former FTC Chairman Engman in which he stated: "I generally would charge an attorney-advisor with the same insider knowledge chargeable to his Commissioner." Even the Ninth Circuit in *Grolier* would not adopt such a broad position.

### A Sufficient Toast

Act II opens with the Gibsons contending that there is insufficient evidence to support Count II, that of the boycott. Specifically, the Gibsons assert that there was no evidence to connect the Gibson sons and companies with the invitation to boycott letter, and no proof that a boycott actually existed. The Commission's finding that the Gibsons engaged in a group boycott, a per se violation of the antitrust laws, relies on the evidence of three companies who refused to meet the price terms demanded for participation in the Gibson Trade Show, the Toastmaster Division of McGraw Edison Co. (Toastmaster), Tucker Manufacturing Co., and Jeannette Glass Co.

Toastmaster participated in the Gibson Trade Show from 1966 to 1970. At a meeting on June 22, 1970, Toastmaster's representative was asked for a payment of three percent of its sales volume to Gibson stores, which the representative refused. Toastmaster was informed that it was not "cooperating" and as a result of this lack of cooperation, it was unable to exhibit at the Gibson Trade Show from August 1970 through 1973. On January 22, 1971, the following letter on Gibson Products Company stationery was addressed to "All Stores" concerning Toastmaster.

The above company will not sell to us at a price we would recommend as being profitable and beneficial for your operation. We, therefore, no longer recommend or authorize this line, and suggest that you discontinue the same.

Please give this your attention, and we appreciate your continued cooperation.

Although Toastmaster continued its attempts to sell to the Gibsons stores, sales volume dropped sharply, from over $950,000 in 1970 to $297,000 in 1971. Toastmaster representatives were told on at least two occasions by franchised stores that they were declining to buy from Toastmaster because of the "All Stores" letter. In 1974, Toastmaster agreed to the terms for participation imposed by Gibson, Sr. and once again participated in the trade show. At this point, Toastmasters' sales to the Gibson stores increased.

Tucker and Jeannette had similar experiences. When negotiating for an exhibit at the February 1971 Trade Show, Tucker's representative refused to pay a two percent volume rebate and was excluded from the Trade Show. On March 11, 1971, a substantially identical "All Stores" letter was sent by Gibson Products Company concerning Tucker. When Tucker representatives subsequently agreed to pay the rebate, the company was readmitted to the August 1971 Gibson Trade Show. Jeannette, directly and through its brokers, was asked for a five percent rebate, to be paid to Gibson, Sr. and not to individual stores. After it refused to make such a rebate, an "All Stores" letter was sent on March 30, 1971. Jeannette was refused readmittance to the shows without the five percent payment and was unsuccessful in attempting to sell to the family-owned stores, though it was able to make some sales to franchised stores.

The ALJ found the Gibsons liable on the Count II boycott charge. The Commission amended the ALJ's order to include Gibson's, Inc., finding that the boycott continued after the November 1, 1972 change in management.

The Gibsons contend that there was no boycott and that the Commission failed to

**568**

prove that the All Stores letter caused the decline in Toastmaster sales. The Gibsons offered several justifications for the All Stores letter in the Toastmaster case, including Toastmaster shipping policies during the Christmas season and dissatisfaction with the Toastmaster warranty program.

*No R.S.V.P. Necessary*

 The All Stores letter concerning Toastmaster is, at the minimum, an invitation to boycott, specifically requesting that the stores refrain from dealing with Toastmaster. The letter is certainly stronger than that found sufficient in *Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Nor is it necessary for a group boycott that there be an express mutual agreement to refuse to deal. The contemplation and invitation for concerted action along with acquiescence is sufficient. From the evidence presented, the Commission found that a substantial number of stores had acquiesced in the request by Gibson Products Company. Although some of this evidence was in the form of hearsay testimony, the Commission Rules of Practice permit the introduction of hearsay evidence, provided that it meets the standards of materiality, reliability and relevance. *See* 16 C.F.R. § 3.43(b); *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 963 (9th Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). The evidence that Toastmaster representatives were told by Gibson franchisees that there was a boycott, along with the actual letter and the substantial drop in sales by Toastmaster to the Gibson stores, amply support the Commission's finding of a group boycott.

Nor was the Commission bound to accept the Gibsons' alternate explanations for the drop in sales: dissatisfaction with Toastmaster products, preference of Toastmaster's sales representatives to sell to distributors instead of directly to retailers, and Toastmaster's lack of access to Gibson retailers, because of its non-participation in the Gibson Trade Show. The evidence concerning dissatisfaction with Toastmaster's

warranty program related to the mid-sixties, several years prior to the boycott. The contention that Toastmaster preferred to sell to distributors is undercut by the testimony of Toastmaster's representative that he continued his attempts to sell to individual Gibson stores even after the boycott began. As to the explanation that the drop in sales was due to non-participation in the Gibson Trade Show, this is merely a "which came first, the chicken or the egg" argument. The only reason Toastmaster did not participate in the Trade Show was its refusal to pay the requested rebate. The Commission's determination that the Gibsons failed to establish a legitimate business reason for the drop in Toastmaster's sales is also supported by the existence of two other All Stores letters, those concerning Jeannette and Tucker, which utilize substantially identical language. Each of the three suppliers refused at some point to pay the required rebate for participation in the Trade Show; each of the three letters is identical in purpose and effect.

 The Gibson sons and companies also contend that there is no evidence to connect them with the invitation to boycott. The All Stores letters, written on Gibson Products Co. stationery, clearly connect the Gibson sons with the action since Gibson, Jr. was president of that company and Gerald Gibson was executive vice-president. Given the overlapping ownership of the corporations and the essential purpose of the Gibson Trade Show to service Gibson stores, there was sufficient evidence that an order including all petitioners was necessary for effective relief. In addition, the Commission in amending the ALJ's order to include Gibson's, Inc., determined that the boycott continued under the management of Gibson's, Inc., a corporation wholly owned by the Gibson sons and used to buy Gibson, Sr.'s retail business.

 The findings of the Commission must be accepted if there is substantial evidence on the record considered as a whole to support them. *FTC v. Standard Education Society*, 302 U.S. 112, 117, 58 S.Ct. 113, 115, 82 L.Ed. 141, 145 (1937);

*FTC v. Algoma Lumber Co.*, 291 U.S. 67, 73, 54 S.Ct. 315, 318, 78 L.Ed. 655, 660 (1934). Where there is the possibility of drawing two inconsistent inferences from the evidence, the Commission may make the choice. *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). In this case, the Commission, based on the All Stores letter and the testimony of Toastmaster's agent, drew the inference that the substantial decline in Toastmaster's sale was as a result of the boycott, a determination which is supported by substantial evidence. The Commission's findings that the boycott of Toastmaster continued until at least 1974 is also supported by substantial evidence. From this finding, the Commission determined that the "institutional management" of the boycott, at least in the post-November 1, 1972 period was in the hands of Gibson's, Inc. There is also substantial evidence to support the Commission's determination that there was substantial commonality of interest prior to November 1, 1972 and that the operations of the Gibsons were sufficiently integrated to require an order covering all petitioners. The Commission, as discussed below, has wide discretion in determining the type of order necessary to remedy unfair practices.

### Assault and Batteries on the FTC Order

In Act III, the Gibsons challenge the finding of the Commission of the payment of illegal brokerage in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). Count III, the § 2(c) charge, concerns the receipt of brokerage fees by Gibson, Sr., from two brokers representing the Ray-O-Vac Division of ESB, Incorporated (Ray-O-Vac), Barshell, Inc. and Al Cohen and Associates, Inc. The FTC tried the charge on the theory that Gibson, Sr. acted as a principal or buyer who split brokerage fees.

### The Miller's Tale

Jim Miller was a broker employed by Ray-O-Vac to represent its products to the Gibson stores for approximately five years, from 1969 to January 1, 1974. Miller also owned all of the stock in Barshell, Inc., a distributor of health and beauty aid products, redistributing such products to various retailers and wholesalers throughout the southwest. Beginning in 1971, Barshell became the sales representative of Ray-O-Vac, representing Ray-O-Vac to the Gibson stores. In this capacity, Barshell was to present Ray-O-Vac sales promotions to Gibson headquarters, conduct necessary negotiations, and have Ray-O-Vac's products listed. In return for these services, Barshell received a 10% brokerage fee. At the time that Barshell sold to the Gibson accounts, about 80% of Barshell's sales were to the Gibson stores. Ray-O-Vac sent commission statements to Barshell recording all of Ray-O-Vac's shipments to the individual Gibson stores and the commission which Barshell had earned on these sales. Miller testified that Gibson, Sr. frequently checked Barshell's commission statements, after which Barshell made payments to Gibson, Sr., termed promotional allowances, on the basis of the sales recorded in the commission statements. A Barshell check in the amount of $13,173.43, dated September 23, 1972, was introduced into evidence and Miller testified that this was a promotional allowance. The ALJ found that the check was a transmittal of brokerage fees by Barshell, received from Ray-O-Vac, to Gibson, Sr., when Gibson, Sr. was owner and operator of various retail stores and thus a buyer from Ray-O-Vac.

Al Cohen and Associates, Inc. acquired the Ray-O-Vac account effective January 1, 1974 to represent Ray-O-Vac to the Gibson stores. Al Cohen was also paid a 10% commission. In an oral agreement, Gibson, Sr. was to increase the sales volume of Ray-O-Vac and Cohen was to pay Gibson, Sr. 90% of the 10% commission. Cohen made monthly payments beginning in 1974 to Gibson, Sr., which payments continued until at least March 1978. The ALJ, finding that Gibson, Sr. was not a "buyer" at the time of the commission splitting with Al Cohen Associates, dismissed the complaint against Cohen.

The ALJ, while finding a violation of Section 2(c) by Gibson, Sr. as to Barshell, specifically found that the allegations against the Gibson sons had not been sustained and that the FTC had failed to tie the sons into the receipt of illegal brokerage. Apparently the FTC had intended to show stock ownership by Gibson, Sr., subsequently given to the Gibson sons, in another of Miller's companies. On this basis, the ALJ dismissed the Count III allegations as to the Gibson sons. The Commission, while upholding the Section 2(c) violation against Gibson, Sr., did not address the FTC's position that all of the Gibson respondents were a "single economic enterprise." Rather, the Commission found that given the interdependence of the Gibson companies, for purposes of relief, there was ample justification to bind all Gibson corporate respondents and family members. The Commission specifically stated that they did not reverse the finding of the ALJ as to the failure by the FTC to tie the Gibson sons into the receipt of illegal brokerage. Rather the Gibson sons were placed under order for "fencing in" purposes.

■ Ever ready to attack the FTC's order, the Gibsons challenge the Section 2(c) violation on several grounds. First, the Gibsons assert that the jurisdictional requirement of "sales in commerce" has not been met. The brokerage payments were allowances upon all Ray-O-Vac sales to Gibson retail stores, both family-owned and franchised, in a 20 state area. Thus the underlying sales were not merely connected with, but directly in, interstate commerce.

### Going for Broch

■ The Gibsons' second jurisdictional argument is that there was no showing of a discrimination in price. For support, the Gibsons rely on *FTC v. Henry Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). First, Section 2(c) on its face absolutely prohibits the payment of brokerage except for services rendered and contains no requirement that a price discrimination occur. Second, *Broch* concerned variable brokerage fees charged for

the purpose of creating discriminatory price advantages, rather than the situation here of a broker splitting part of his commission with the buyer. In fact, in *Broch*, the Supreme Court, in reviewing the legislative history of Section 2(c), stated:

> One of the favorite means of obtaining an indirect price concession was by setting up "dummy" brokers who were employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the seller pay "brokerage" to these fictitious brokers who then turned it over to their employer. This practice was one of the chief targets of § 2(c) of the Act.

363 U.S. at 169, 80 S.Ct. at 1160, 4 L.Ed.2d at 1128 (footnote omitted). We agree with the Commission that Section 2(c), in light of the language and purpose, requires no price discrimination in a situation of dummy brokerage such as is involved here.

■ The Gibsons also argue that there is no evidence that Gibson, Sr. was connected with buying so as to meet the statutory requirement of a "buyer". We find this argument without merit since the ALJ and the Commission found that, at least as to the check in September 1972, Gibson, Sr. was a buyer within the context of his personal ownership and operation of individual retail stores, as well as in his role as head of Gibson Products Company.

### Beauty Is Only Skin Deep

■ Next the Gibsons maintain that there is no proof to support the Section 2(c) violation. Gibson, Sr. contends that the check issued on September 23, 1972 from Barshell, rather than being illegal brokerage, was an unrelated 3% commission due Gibson, Sr. for sales by the Gibson Trade Show of beauty and health products belonging to Barshell. Miller, Barshell's sole stockholder, identified the check in question as a payment of brokerage fees and also testified that Gibson, Sr. would periodically review Barshell's commission statements to assess a charge as his fee upon this commission. Lynn Lowe, a trade show buyer for Gibson, Sr., provided contrary testimony in-

dicating that the check was in payment for the trade show's sales of Barshell's health and beauty aids. The ALJ and the Commission found Lowe's argument would not wash. There was evidence that Miller sold his health and beauty aids not through Barshell, but through his other corporation, Progressive Brokerage. In fact, Miller testified that Barshell was formed specifically to be a housewares distributor and for that reason the Ray-O-Vac account moved through Barshell. The ALJ and the Commission were entitled to draw the inference that had the payments been for the purpose described by Lowe the check would have been made out by Progressive Brokerage, rather than Barshell. Although conflicting testimony was presented, there was substantial evidence from which the Commission could find a violation of Section 2(c). Our task is not to reweigh the evidence but only to determine whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Steadman v. SEC*, 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69, 77 (1981), quoting *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140 (1966).

The Gibsons also claim that the payments in questions here are exempt from Section 2(c), falling within the "for services rendered" exception. We need not here decide whether this exception applies to payments made to a buyer because the Commission found, and we agree, that the Gibsons failed to provide adequate evidence to substantiate this claim. The Gibsons would have us believe that since they introduced evidence of Gibson, Sr.'s services in selling products of Barshell and since Barshell compensated Gibson, Sr. by check and never asked for a refund, "the presumption then is that the services were reasonably worth the amount paid." This argument, however, fails to consider that the ALJ and the Commission found that the check in question had nothing to do with Gibson's services but rather was a payment for brokerage.

The Gibsons' final contention is that there is no evidence to connect Belva Gibson or the Gibson sons with the Section 2(c) violation. The brokerage payments from Barshell to Gibson, Sr. were based on Ray-O-Vac sales to Gibson retail stores at a time when Gibson Products Company was wholly owned by the Gibsons. As the Commission stated:

"The Gibson Products Company, through which Gibson, Sr. conducted the franchising, trade show and brokerage businesses, and the various corporate entities through which the Gibson-owned retail stores were operated were completely interdependent and under the control of the same few individuals in the Gibson family. For purposes of relief, in this environment, there is ample justification to bind all Gibson corporate respondents, except dissolved corporations, and all Gibson family respondents in order to insure that the order we issue today is not circumvented."

### Don't Fence Me In

In this final act the Gibsons challenge the FTC order as overly broad. This argument also includes the assertions of lack of evidence to connect the Gibson sons and corporations with the boycott and Section 2(c) violations. They contend that the evidence used pertains only to Gibson, Sr. and that including the other petitioners is merely "guilt by association". The Gibsons also attack the order as arbitrary and overly broad by requiring notice to the FTC of change in employment for a ten year period and prior notification to the FTC of corporate acquisitions, reorganizations, etc.

The Commission clearly found that a broad order was necessary for effective enforcement in light of the interrelationship among the Gibson family members and corporations. "At least since November 1, 1972, there has been an enhanced potential for Gibson, Sr. to act as agent or intermediary for retail stores owned by other members of the Gibson family. Indeed, he owns no stores outright at this time, meaning that, leaving aside the possibility

of treating all respondents as a 'single enterprise,' an order limited to Gibson, Sr. as a buyer might have little practical effect." The Commission has wide discretion in determining what type of order is necessary to remedy the unfair practices found. *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 611, 66 S.Ct. 758, 760, 90 L.Ed. 888, 892 (1946); *FTC v. National Lead Co.*, 352 U.S. 419, 428–29, 77 S.Ct. 502, 508–09, 1 L.Ed.2d 438, 444–45 (1957); *Alterman Foods, Inc. v. FTC*, 497 F.2d 993, 1001 (5th Cir. 1974). "[T]he courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." *National Lead*, 352 U.S. at 428, 77 S.Ct. at 508, 1 L.Ed.2d at 444. The use of a broad order within the context of interwoven corporate entities is within the Commission's discretion where the remedy is reasonably related to the violation. *See Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171 (1st Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964). In this case where there is a substantial interrelationship among the Gibson family members and corporations, and where the trade show and franchising aspects overlap, the FTC order, by enjoining the Gibson sons, Belva, and the corporations as well as Gibson, Sr., is reasonably related to the remedies sought, that is to restrain further violations of Section 2(c) and to block possible group boycotts of the type here found.

### Pro Bono Publico

The Gibsons' swan song is that the order is not in the public interest. This chorus appears to rely on the contentions that the FTC failed to prove injury to competition or the existence of a "continuing practice". First, the violations at issue here are *per se* and thus do not call for extensive analysis of anticompetitive effect. The Commission has broad discretion in determining whether the public interest requires an order. *Cotherman v. FTC*, 417 F.2d 587, 594–95 (5th Cir. 1969). Nor have the Gibsons demonstrated that there is no risk of repeated violations. The Commission specifically responded to the argument that no order was necessary since the practices were isolated.

Respondents cannot and do not contend that the law violations were inadvertent or that these practices were voluntarily abandoned, even after issuance of the complaint. Given the nature and structure of their business operation, which remains essentially unchanged, and given the absence of any evidence of abandonment, we find that an order is necessary to combat a cognizable danger of recurrence of the violations.

We find that the order, while broad, is reasonably related to the practices found to be in violation of the FTC Act and Robinson-Patman Act and that the FTC could conclude that these provisions are necessary to prevent future violations within the context of the interrelated corporate and family respondents. We bring down the curtain on this 15-year proceeding by ordering that the Commission's order be enforced.

AFFIRMED AND ENFORCED.